UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

CHIRAYU S. RANA,

Plaintiff,

-against-

JPMORGAN CHASE BANK, N.A., LORNA HAJDINI, BRANDON GRAFFEO, JON WOLTER, and KELLY CROWE,

Defendants.

---------------------------------------------------------------X

Case No.: **26-cv-06351**

**AMENDED COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff Chirayu S. Rana ("Mr. Rana" or "Plaintiff"), by his attorneys, JOSEPH & NORINSBERG, LLC, for his Complaint against defendants JPMorgan Chase Bank, N.A. ("JPMorgan" or the "Firm"), Lorna Hajdini ("Hajdini"), Brandon Graffeo ("Graffeo"), Jon Wolter ("Wolter"), and Kelly Crowe ("Crowe") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1. "***Just keep that damn monkey busy so he keeps quiet***." That was JPMorgan's answer to Chirayu S. Rana, the most productive banker on its Leveraged Finance team and the only person of color on it. They reduced Mr. Rana to a "point system" diversity token, a head to be counted, not a banker to be valued.

2. They did not call Plaintiff by his name. To the colleagues and supervisors who worked beside him every day, Chirayu Rana, a first-generation American of Nepali descent, was a "**monkey**," a "**brown boy**," a "**Brownie**," a "**boy**," and a man who, they sneered, would pay for things in "rupees." In person and in writing, in the Firm's *own systems* and to his face, JPMorgan's bankers erased his name and reduced him to his skin color.

3. Racism at JPMorgan was not hidden behind closed doors or whispered in private. It was out in the open. It was part of the team's everyday culture. The team's group text reflected that culture. On June 18, 2024, Crowe asked the entire team, in a group text about Mr. Rana, "**Can I bring the other brown boy?**"




*June 18, 2024 Brown Boy Text Message*

4. This was not the prejudice of a lone racist employee. It was emblematic of the culture of JPMorgan's Leveraged Finance team, and the team's own managers would later admit as much.

5. Vice President Tom Goodrich ("Goodrich") did exactly that. Speaking to a group of JPMorgan colleagues and other third-party witnesses outside the office on June 1, 2024, he matter-of-factly stated: "***we all call him Brown Boy at the office***." That was not merely an offensive remark. It was an admission that the racial degradation of Mr. Rana was collective, normalized, and routine. Goodrich did not say that he called Mr. Rana "Brown Boy." He said, "we all" did.

6. Graffeo himself led the degradation. At the team's September 2024 offsite, Mr. Rana asked Graffeo whether the scheduled meetings had assigned seats. Graffeo responded, "***Yeah, yours is outside, Brown boy***," then mouthed "Brown boy" to Crowe, who laughed in response.

7. Graffeo's motive was no secret. Hajdini told Mr. Rana, on multiple occasions, that Graffeo had told her that the only reason he hired Mr. Rana was that he needed a "Brown guy" on the team, and that his hiring was merely part of the "point system" internally at JPMorgan. In other words, Mr. Rana was not hired because of his talent and industry experience. He was hired to satisfy a diversity metric.

8. The racist abuse did not end with slurs. It infected the team's daily communications, where Mr. Rana's South Asian heritage became the punchline for a stream of degrading jokes. After defendant Crowe circulated a photograph of a Nepalese barbershop, the team mocked Mr. Rana by joking that the shop would "***probably accept your rupees, Chirayu.***"




*Team group-chat messages regarding the Nepalese barbershop.*

9. The ridicule continued. In another team group chat, after discussing the cost of a ticket, Crowe quipped, ***"$7,000,000 rupees for Kelly's ticket,"*** prompting the response, "They got Venmo for rupees?"




*Team group-chat exchange regarding "rupees."*

10. These were not isolated attempts at humor. They were calculated racial taunts that reduced Mr. Rana to a crude ethnic stereotype, repeatedly ridiculing his ancestry, his national origin, and his identity in front of his coworkers. Their casual, public nature demonstrates just how deeply racism had become embedded in the team's everyday culture.

**The Team's Bigotry Extended to Other Minority Groups as Well.**

11. Mr. Rana was not the only target of the team's bigotry. The same contempt was openly directed at other minority groups. On Juneteenth, Goodrich referred to Black Americans as ***"Blackies"*** and mocked the holiday itself, scoffing that they had been "***allowed their own holiday now***," that they "***already had MLK Day,***" and then, laughing derisively, said, "***How much more do they want? Equal rights?***"

12. The racism was not accidental. It was not isolated. It was institutional. It reflected the values of the team and, as Mr. Rana was repeatedly told, the values of its leadership.

13. Hajdini told him exactly why. Firm leadership, she explained, "want[s] to keep it white and Christian," sought to "***keep the firm strong and white***," and favored people "who look like Jamie Dimon." She left nothing to interpretation: "***Jay [Droogan] is tired of all these f**king***

***Asians and Indians taking up space,*** especially on the Strategy side. Leadership on the IB side will remain white… JPM loves their white boys and Christian leaders."

14. The team's culture of bigotry was not confined to race. It extended to other protected groups as well, including blatant anti-Semitism. After Mr. Rana attempted to introduce Goodrich to a woman he believed Goodrich would like, Goodrich expressed immediate interest after seeing her photographs. However, the moment he learned that she was Jewish, he lost all interest. "Well I am not Jewish so…," he bluntly stated, revealing that, in his view, being Jewish was a disqualifier.

15. Mr. Rana reacted with disbelief, asking whether Goodrich was really refusing to meet her simply because she was Jewish. Goodrich did not deny it. Instead, he immediately turned to concealment. "*You got to keep it down—too many women in the office,*" he warned, before directing Mr. Rana to lie about the real reason: "I dunno you can just say he's not that into her based on the pics." Goodrich's concern was not that his blatant anti-Semitism was wrong. It was that others in the office might learn about it. Rather than abandon his prejudice, he sought to conceal it and enlisted Mr. Rana to help carry out the deception.

16. The message underlying both the team's racism and its anti-Semitism was unmistakable: those who were different did not belong. Mr. Rana lived that reality every day. He was not merely one of the few minorities on JPMorgan's Leveraged Finance team. He was the team's ***<u>only</u>*** non-white, non-Christian banker. Every manager and every member of the team knew exactly who he was because he alone looked different, came from a different cultural background, and practiced a different faith. His isolation was obvious to anyone who looked at the team's roster.




*JPMorgan Leveraged Finance team roster.*

17. Mr. Rana lived that message every day. Rather than being accepted as a valued colleague, he was singled out, reduced to his race and national origin, and treated as an outsider from the day he joined the team.

**Mr. Rana Formally Reports the Racial Discrimination and Sexual Abuse.**

18. The racial abuse was only part of Mr. Rana's ordeal. As detailed further below, his direct supervisor, Hajdini, also exploited and weaponized her position of authority to subject him to unwanted sexual conduct, conditioning his advancement on submission and threatening to ruin him if he refused. Like the racism that permeated the team, the abuse depended on the same imbalance of power and the same expectation that Mr. Rana would remain silent.

19. He remained silent only as long as he believed he had no choice. While on JPMorgan-approved leave to care for his seriously injured mother, a leave the Firm itself designated under both the FMLA and New York Paid Family Leave, Mr. Rana finally came

forward. On May 20, 2025, through counsel, he submitted a highly detailed written complaint identifying Graffeo and Wolter for the racial abuse and Hajdini for the sexual coercion.

20. Following a continued stream of retaliation from Graffeo, Wolter, Hajdini, Goodrich, Crowe, and other members of the team while at the office during working hours, Mr. Rana raised a further formal complaint concerning Crowe. In a June 5, 2025 email, Mr. Rana requested that he be treated "fairly and equally" as his peers Goodrich and Cameron Gray ("Gray") were treated on their respective deals and workstreams, and that he be respected "as an equal human being despite any perceived cultural and/or ethnic differences." In response, Wolter referred Mr. Rana to JPMorgan's Code of Conduct hotline, 1-855-JPMCODE. The next day, JPMorgan HR Partner Kathryn Neary ("Neary") responded by email: "I have passed these concerns over to Employee Relations. Mark Paul ("Paul") will review and follow up with you."

**JPMorgan Responds to Mr. Rana's Complaint with Immediate Retaliation.**

21. JPMorgan's response was immediate. It did not investigate. It retaliated. Just days after his June 5, 2025 email, and less than two weeks after Plaintiff's May 20, 2025 complaint, JPMorgan cut Mr. Rana's pay by more than half, revoked his access to its IT systems and email, and placed him on indefinite involuntary leave. Meanwhile, every individual he had accused remained in place and continued performing their jobs without consequence. JPMorgan also instructed Mr. Rana's colleagues, friends, and family members across the bank to cease all communication with him immediately.

22. In a recorded conversation on June 6, 2025, JPMorgan's own Employee Relations Partner, Paul, *admitted* that Mr. Rana had done nothing wrong. When Mr. Rana asked whether he had done something wrong, Paul responded unequivocally: "*No, we're not saying that at all.*" Yet when Mr. Rana directly accused JPMorgan of retaliation, Paul never denied the charge. Instead,

he repeatedly refused to explain why Mr. Rana was being removed from the workplace. He identified no misconduct, no policy violation, and no legitimate basis for the decision. JPMorgan's response to a detailed complaint of race discrimination, sexual assault, and serious compliance violations was not to remove the alleged wrongdoers. It was to remove the whistleblower.

23. Worse still, the retaliation did not end with Mr. Rana's removal from the workplace. Instead, he and his family became the targets of explicit racial intimidation, including a threat warning them to "RUN BEFORE WE CALL ICEE [sic] ON YOUR FAMILY."







Text Message Dated September 9, 2025

24. The threats were not the work of strangers. "Brown" and "Brown boy" were the team's own private vocabulary of degradation, used in its group chats, at its offsites, and to Mr. Rana's face. No one outside the team was privy to those terms or to their use against Mr. Rana.

25. The same is true of the threats' mockery of Nepal and their means of delivery. No one outside Mr. Rana's immediate team knew that he came from a Nepali family, and no one else had ridiculed that heritage. And the threats arrived on Mr. Rana's personal cell phone, a number he never made public and that, apart from his family and close friends, only members of his team possessed. Every marker pointed to one source: the JPMorgan team Mr. Rana worked with every day.

**JPMorgan Stonewalls Plaintiff's Requests to Investigate the Threatening Messages.**

26. Following the anonymous threats directed at Mr. Rana and his family, Plaintiff, through counsel, repeatedly requested that JPMorgan investigate the threats, preserve relevant electronic evidence, and determine whether those responsible were associated with the Firm. Plaintiff explained that the threatening messages contained the same unique racial slurs and insider terminology used within his JPMorgan team and referenced personal information known only to team members. Those circumstances made an internal investigation both necessary and urgent.

27. Despite having the resources, technology, and internal records needed to determine whether the threats originated within the Firm, JPMorgan refused to conduct a meaningful investigation. It did not identify those responsible or preserve readily available evidence. Instead, it chose to turn a blind eye to the harrowing racial threats directed at Plaintiff and his family.

**Defendants Must Now Be Held Fully Accountable.**

28. This action seeks to expose and remedy a workplace where racism was normalized, sexual coercion was tolerated, and retaliation was weaponized against those who refused to remain silent.

29. As a direct result of Defendants' unlawful conduct, Mr. Rana's career has been irreparably destroyed. He has now been effectively blackballed from the private credit and

leveraged finance industry. His reputation has been destroyed, his professional relationships shattered, and the career he spent years building reduced to rubble. This was not an unintended consequence of Defendants' misconduct. It was its intended result.

30. After Defendants forced him from JPMorgan, Plaintiff attempted to rebuild his career rather than immediately commence litigation. He accepted new employment, pursued confidential administrative remedies with the Equal Employment Opportunity Commission ("EEOC"), and sought only to move forward with his professional life. Only after Defendants continued retaliating against him and destroyed that new employment did Plaintiff conclude that litigation had become unavoidable.

31. Having permanently destroyed Mr. Rana's career, Defendants must now be held fully accountable under the law. Accordingly, the Complaint asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"); the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ("NYCHRL"); the New York Labor Law §§ 193, 215 ("NYLL"), the New York City Victims of Gender-Motivated Violence Protection Law ("GMVA"), and New York common law. Mr. Rana seeks back pay, front pay, lost benefits, liquidated damages, compensatory damages, punitive damages, equitable relief, attorneys' fees and costs, and all other relief to which he is entitled.

## **JURISDICTION AND VENUE**

32. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the FMLA, 29 U.S.C. § 2617(a)(2), and 42 U.S.C. § 1981.

33. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Mr. Rana's claims under the New York State Human Rights Law, the New York City Human Rights Law, and New York common law, because they arise from the same case or controversy as his federal claims.

34. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions occurred in this District, where Mr. Rana worked at JPMorgan's New York offices, and because defendant JPMorgan resides and conducts business here.

**PROCEDURAL HISTORY**

35. On March 31, 2026, Mr. Rana signed a Charge of Discrimination, Charge No. 520-2026-04653, which was filed with the EEOC on or about April 1, 2026. On July 6, 2026, the EEOC issued a Dismissal and Notice of Rights with respect to that Charge, notifying Mr. Rana of his right to sue. This action is commenced within 90 days of Mr. Rana's receipt of that notice. Mr. Rana has therefore exhausted his administrative remedies and satisfied all conditions precedent to suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

36. On April 27, 2026, Mr. Rana's prior counsel commenced an action against JPMorgan and Hajdini in the Supreme Court of the State of New York, New York County, Index No. 155620/2026, arising from the same conduct alleged herein. Mr. Rana thereafter moved to voluntarily discontinue that action without prejudice pursuant to CPLR 3217(b) to pursue his federal claims in this Court, and by order dated July 14, 2026, the court granted that application. No other action arising from the facts alleged herein is pending.

37. No administrative exhaustion is a prerequisite to suit on Plaintiff's FMLA, § 1981, NYSHRL, NYCHRL, or common-law claims, and Plaintiff has exhausted administrative remedies with respect to his Title VII claims as alleged above.

38. Pursuant to NYCHRL § 8-502, Mr. Rana will serve a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

**PARTIES**

39. Plaintiff Chirayu S. Rana is a first-generation Nepali American and, at all relevant times, was employed by JPMorgan in New York, New York. Mr. Rana resides in New York.

40. Defendant JPMorgan Chase Bank, N.A. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. At all relevant times, JPMorgan was Mr. Rana's "employer" within the meaning of the FMLA, the NYSHRL, and the NYCHRL, and a party to a contractual employment relationship with Mr. Rana within the meaning of 42 U.S.C. § 1981.

41. Defendant Lorna Hajdini is an Executive Director at JPMorgan who, at all relevant times, exercised direct supervisory authority over Mr. Rana. She resides in New York.

42. Defendant Brandon Graffeo is a Managing Director at JPMorgan who led Mr. Rana's team and exercised supervisory authority over him. He resides in New York.

43. Defendant Jon Wolter is a Managing Director at JPMorgan who exercised supervisory authority over Mr. Rana. He resides in New York.

44. Defendant Kelly Crowe is an Associate on the Leveraged Finance team. Upon information and belief, she resides in New York.

45. Defendants Hajdini, Graffeo, Wolter, and Crowe each personally and intentionally participated in the discriminatory and retaliatory conduct alleged herein and are individually liable under 42 U.S.C. § 1981 and as employers and aiders and abettors under the NYSHRL and NYCHRL.

## FACTUAL ALLEGATIONS

**Mr. Rana Was the Team's Highest-Producing Originator.**

46. Mr. Rana joined JPMorgan's Leveraged Finance group in March 2024 and immediately distinguished himself. He closed more deals than anyone else on the team, including his white Vice President peers, Goodrich and Gray. He closed the first Annual Recurring Revenue lending transaction in the group's history. JPMorgan's strategy team engaged him to develop private credit and direct lending proposals that his senior colleagues presented directly to JPMorgan's Executive Committee and its Chief Executive Officer, Jamie Dimon. He introduced external private equity sponsors and internal JPMorgan relationships to Graffeo and Wolter, and he routinely completed work assigned to others, corrected errors in colleagues' work product, and mentored junior team members.

**Hajdini's Control Over Mr. Rana's Career and JPMorgan's Stripping of His Vice-Presidential Authority.**

47. None of that production protected Mr. Rana, because the person with the greatest power over his career was also his abuser, Defendant Lorna Hajdini. Hajdini's power over Mr. Rana extended well beyond her formal title. At all relevant times, she exercised control over his career trajectory, his performance evaluations, and the resources on which his production depended.

48. That control was structurally amplified by Hajdini's close professional alignment with Jay Droogan ("Droogan"), the head of the business segment, under whom she had previously served. Graffeo, in turn, reported directly to Droogan. Through those relationships, Hajdini enjoyed a direct conduit to the executives who controlled Mr. Rana's advancement, and she used it: she influenced his promotion eligibility, orchestrated threats of demotion, and controlled the

allocation of the support and resources his role required. That proximity to leadership also insulated her from ordinary managerial oversight.

49. Although formal personnel decisions concerning Mr. Rana nominally rested with more senior executives, those decision-makers deferred to and adopted Hajdini's subjective, biased assessments of Mr. Rana without independent investigation. Her evaluations and recommendations were, in practice, rubber-stamped.

50. Hajdini weaponized that control by systematically withholding critical team support, headcount, and resources from Mr. Rana. Although Mr. Rana generated more business than any of his white Vice President peers, he was assigned only one support employee while Goodrich and Gray each received three. By engineering that operational deficit, Defendants deliberately compromised Mr. Rana's ability to execute his mandates and manufactured a pretextual basis for adverse performance assessments.

51. Defendants also stripped Mr. Rana of the core supervisory authority that his Vice President title carried. In a stark departure from both industry norms and JPMorgan's own internal protocols, Mr. Rana was the only Vice President in the group who was categorically barred from providing formal performance reviews for personnel under his purview, including Amelia Norris ("Norris") and Crowe.

52. At the same time, JPMorgan excluded Mr. Rana from the standard 360-degree, peer, and upward evaluation processes in which all similarly situated Vice Presidents participated. Unlike his peers, Mr. Rana was blocked from submitting performance feedback concerning senior team members and peers, including Wolter, Hajdini, Gray, and Goodrich.

53. That exclusion served a dual purpose. It publicly diminished Mr. Rana's managerial stature, signaling to peers and subordinates alike that he had been stripped of the authority his title

conferred. And it neutralized his ability to document Hajdini's misconduct and the team's operational failures through JPMorgan's own formal reporting channels.

54. The confluence of Hajdini's unchecked control, her leveraged proximity to Droogan and Graffeo, and the targeted restriction of Mr. Rana's Vice-Presidential responsibilities, imposed on him alone, was part of the same coordinated pattern of discriminatory disparate treatment alleged throughout this Complaint. It was also the foundation on which Hajdini built the campaign of coercion described below.

**Hajdini Groomed, Isolated, and Coerced Mr. Rana.**

55. Almost immediately after becoming Mr. Rana's direct supervisor, Hajdini began dismantling the professional boundaries that should exist between a manager and her subordinate.

56. Hajdini's demands turned coercive within weeks. On May 14, 2024, after Mr. Rana declined Hajdini's invitation to join her for a drink and then to join her in her Uber, she turned threatening: "*You know I'm still your boss and what I say goes here at JPM. Trust me, I own you.*" Three days later, on May 17, 2024, when Mr. Rana again declined an after-work invitation, she was explicit: "*If you don't f**k me soon, I'm going to ruin you… Never forget, I f**king own you.*"

57. On May 20, 2024, Hajdini hosted the team at her private membership club. Throughout the evening, she repeatedly groped Mr. Rana's leg, groin, and buttocks under the table. He physically pushed her hands away, but she persisted, degrading him with a racial slur as she did: "*You want this Executive Director life? You want to get paid like me? You're gonna need to earn it* ***my little Brown boy***."

58. Mr. Rana tried to get away from her through proper channels. Shortly thereafter, he traveled to Greenwich, Connecticut, to meet in person with Wolter. He asked Wolter to staff him with team members other than Hajdini and Crowe, who was close to Hajdini, because he did not

feel comfortable working with them. Embarrassed by the situation and fearful that Hajdini would retaliate, he did not disclose the details of her sexual advances. Wolter told Mr. Rana he would assign him to work with others on the team. He then continued staffing Mr. Rana on projects with Hajdini and Crowe.

59. Mr. Rana could not simply walk away. As his direct supervisor, Hajdini exercised significant influence over his work assignments, performance evaluations, compensation, and opportunities for advancement. Mr. Rana reasonably understood that rejecting his supervisor carried obvious professional consequences.

60. Hajdini was careful to leave as little documentary evidence as possible. She rarely committed her increasingly personal demands to writing. The written communications that do exist nevertheless reveal her deliberate efforts to move her relationship with Mr. Rana beyond legitimate workplace interactions.

61. Among those communications, on October 17, 2024, Hajdini invited Mr. Rana, and Mr. Rana alone, to a private book-launch reception at the Blackstone building unrelated to JPMorgan business:

On Oct 17, 2024, at 15:17, Lorna Hajdini
<lorna.hajdini@gmail.com> wrote:

Theoretically I'm going to this on Tuesday after 5:30. Want to join? It's at the blackstone building.

I don't know how I even got this invitation but I must be on some distro at Spencer Stuart. Topic looked interesting so why not.

Lorna Hajdini (914) 310-[redacted]

---------- Forwarded message ---------
From: **Jason Baumgarten**<jbaumgarten@spencerstuart.com>
Date: Fri, Sep 13, 2024 at 3:39 PM
Subject: Exclusive Event Invitation: Join Us for Spencer Stuart's "The Life Cycle of a CEO" Book Launch Celebration at Blackstone
To: <lorna.hajdini@gmail.com>

*October 17, 2024, Gmail invitation from Defendant Hajdini addressed solely to Mr. Rana.*

62. She also used her personal email account to invite him to other events that had nothing to do with work. These communications served no legitimate business purpose. They reflected Hajdini's deliberate effort to erode the professional boundaries between supervisor and subordinate. Mr. Rana was not free to decline them. Hajdini controlled his assignments, his performance evaluations, and the Executive Director promotion she repeatedly threatened to destroy. His outwardly accommodating responses reflected the coercive reality of his circumstances, not consent.

63. Hajdini's conduct was not limited to those few documented communications. She repeatedly sought out Mr. Rana outside the workplace. On multiple occasions, she appeared unannounced at the apartment of a family member, where she knew he frequently stayed, despite never being invited there. During one such encounter, Hajdini remarked that she knew the building had no security cameras. The statement was plainly intended to intimidate Mr. Rana, and it did.

64. Hajdini also surreptitiously followed Mr. Rana on other occasions, reinforcing that she was monitoring his movements and could appear whenever she chose.

65. Hajdini made clear she was watching far more than his movements. She told Mr. Rana she knew "every move" he made, and she proved it, reciting purchases he had made through his Chase bank account, restaurants where he dined, doctors he had seen, prescription medications he was taking, the dates and locations of his Citi Bike rides, his prior addresses, and where he attended high school. Hajdini had no legitimate way to know that personal information. She deployed it as an instrument of intimidation and control.

66. Hajdini soon acquired another means of control. She learned that a close friend of hers had worked with Mr. Rana at his prior employer. She repeatedly let Mr. Rana know that she had spoken with that individual and cryptically suggested that she knew things about his past that could ruin him, deliberately leaving the details unstated.

67. Hajdini returned to that subject repeatedly. Whenever Mr. Rana attempted to distance himself from her or resist her demands, she reminded him of what she claimed to know. She suggested that revealing it would destroy his reputation and career.

68. Hajdini never allowed Mr. Rana to forget the threat. She repeatedly invoked her purported inside knowledge as a continuing source of leverage. She made clear that if he rejected her advances or crossed her, she would use it to destroy him both personally and professionally.

69. Hajdini also told Mr. Rana that JPMorgan would never take his side. "*Brandon [Graffeo] and Jon [Wolter] need a senior woman on the team, so* ***I'm irreplaceable,***" she told him. "*I know people in the industry and I can control the narrative about you,* ***no one will believe you***." 

70. By this point, Hajdini had accumulated multiple forms of leverage over Mr. Rana. She was his direct supervisor. She exercised significant influence over his work, his evaluations, and his advancement within the Firm.

71. Against that backdrop, what followed was not a consensual workplace relationship. It was the product of escalating coercion.

72. Mr. Rana had no romantic or sexual interest whatsoever in Hajdini.

73. Because of that, Mr. Rana repeatedly attempted to avoid Hajdini's advances. Yet he remained trapped by the authority she exercised over his career and feared the professional consequences of rejecting his direct supervisor.

74. Hajdini repeatedly conditioned Mr. Rana's career advancement on compliance with her sexual demands. She repeatedly told Mr. Rana that she "owned" him, threatened to sabotage his anticipated Executive Director promotion if he refused her advances, and made clear that his future at JPMorgan depended upon satisfying her demands.

75. Hajdini repeatedly warned Mr. Rana that if he continued rejecting her sexual demands, she would expose what she claimed to know about his prior employment, destroy his opportunity to become an Executive Director, and ruin both his career and his reputation.

76. Hajdini also viewed Mr. Rana's extraordinary production as her pathway to the Managing Director promotion she had long sought. She repeatedly conveyed that his ability to originate and close lucrative transactions would elevate her standing within JPMorgan and finally secure that promotion, while promising that she would, in turn, help him become an Executive Director.

77. In reality, the arrangement flowed only one way. Hajdini exploited Mr. Rana's production, his relationships, and her supervisory authority to advance her own career while dangling his anticipated promotion as the price of his compliance.

78. By the time Hajdini's conduct turned physical, she had methodically accumulated multiple forms of leverage over Mr. Rana. She had become his direct supervisor, blurred the line

between professional and personal interactions, repeatedly invoked what she claimed to know about his prior employment, and tied his future at JPMorgan to compliance with her personal demands. The sexual assaults that followed were the culmination of that escalating course of coercion.

**Hajdini Used Threats, Blackmail, and Supervisory Authority to Carry Out Repeated Sexual Assaults.**

79. Hajdini's coercion culminated in repeated acts of sexual assault. On multiple occasions, she overrode Mr. Rana's repeated refusals, using the supervisory authority, threats, and leverage she had amassed over him to force sexual contact to which he never consented. Hajdini even drugged him. During these encounters, when Mr. Rana was unable to sexually perform, Hajdini covertly spiked his drink with a performance-enhancing substance without his knowledge or consent, a fact she later admitted to him, telling him that she had given him "a little something" to help his performance.

80. The assaults began in the summer of 2024, and they began in public. In or about July 2024, while riding the subway with several team members to a team gathering in Brooklyn, Hajdini covertly groped Mr. Rana's crotch without his consent.

81. That same month, Hajdini invited herself to Mr. Rana's family member's Manhattan apartment, knowing that he was headed there. When Mr. Rana unequivocally rejected her advances, she made the price of refusal explicit: "*Do you want to get promoted at year end or not*? *Do you want a future at JPMorgan? It's that simple. I don't know why you're fighting this.*" Without waiting for an answer, she removed her shirt, forcibly removed Mr. Rana's pants, and performed oral sex on him.

82. Mr. Rana, in overwhelming distress, protested and began to cry. Hajdini laughed at and scolded him for crying and demanded to know whether he thought anyone would ever believe

him. Hajdini then continued to demand that he perform sexual acts for her pleasure. Afraid that she would carry out her threats of blackmail and retaliation, Mr. Rana, humiliated, complied.

83. Hajdini's physical aggression was public as well. At a September 13, 2024 team outing she organized at the Barclays Center, Hajdini arranged to sit next to Mr. Rana and repeatedly forced herself on him, licking his neck and grabbing his genitals through his clothing. Each time, Mr. Rana pushed her off and told her to stop. She persisted despite his resistance and the public setting.

84. In late September 2024, following a work gathering, Hajdini turned on Mr. Rana, yelling that he was not doing enough to help her originate deals that would support her promotion to Managing Director. She then threatened him explicitly: "I f**king own you! I will make you pay… ***You really think Brandon [Graffeo] and Jon [Wolter] want some Brown boy Indian leading Originations****?*** ***...*** *If you don't f**k my brains out tonight, I'm going to sabotage your ED (Executive Director) promotion… I own you! Don't you forget that*!" Frightened by her threats of retaliation, Mr. Rana relented and went with her.

85. The assault that followed occurred at the family member's apartment in Manhattan. An individual staying there has sworn under penalty of perjury that he was awakened in the middle of the night when Hajdini arrived with Mr. Rana.

86. Hajdini was visibly intoxicated and speaking so loudly that she awakened the witness. Mr. Rana repeatedly implored Hajdini to be quiet, but Hajdini loudly refused, insisting that she would not. As they entered the apartment, Mr. Rana explained that Hajdini was his supervisor at JPMorgan.

87. Minutes later, Hajdini emerged completely naked, sat on the living room couch, lit a cigarette, and repeatedly demanded that the witness "come join us." When he repeatedly refused,

Hajdini declared, "*You know, I own Chirayu, so you'd better come join.*" She then returned to the bedroom.

88. Through the closed bedroom door, the witness heard Mr. Rana repeatedly pleading, "No, no, this isn't right," "You have to leave," "I'm not going to do this," and "Please stop."

89. When Hajdini finally left the apartment, the witness watched Mr. Rana emerge from the bedroom visibly shaken and in a state of shock. Mr. Rana immediately disclosed that Hajdini had been sexually harassing him and repeatedly forcing him into sexual acts.

90. Immediately after the assault, Mr. Rana further explained to the witness that Hajdini routinely told him, in substance, that she was in charge of him, would get what she needed from him, and threatened him and that if he did not comply, there would be trouble.

91. In later conversations, while the abuse remained ongoing, Mr. Rana again told the witness that Hajdini was blackmailing him, forcing him into sexual acts, and repeatedly threatening to damage his career if he refused her demands.

92. Hajdini's conduct did not occur in secret. A second independent witness observed Hajdini press herself against Mr. Rana, kiss his neck, and grab his rear end. Throughout the encounter, Mr. Rana turned his head away, appeared visibly uncomfortable, and made no effort to reciprocate.

93. In or around September 2024, Hajdini forced her way back to the apartment. Mr. Rana tried to dissuade her from accompanying him, telling her he was exhausted from work. She insisted, reminding him that her performance review of him was due soon and telling him that if he let her come, she could "promise" that he would be promoted to Executive Director. Mr. Rana understood the threat behind the promise. He relented, but told her that he did not want to have sex or be intimate in any way.

94. As Hajdini and Mr. Rana entered the apartment building that evening, they passed another witness, who was on her way out. Hajdini appeared intoxicated and was speaking loudly. Mr. Rana appeared visibly irritated, avoided eye contact, and unsuccessfully tried to quiet her.

95. As they passed, Hajdini declared, "*I own you Brownie.*" Because the remark was made as they crossed paths, the witness, who herself has a darker complexion, initially believed Hajdini was speaking to her. Moments later, however, she realized that Hajdini had directed the remark at Mr. Rana.

96. The witness was so taken aback by the racial remark that she briefly considered confronting Hajdini and saying, *"Excuse me?!"* Although angered by Hajdini's comments, the witness ultimately decided to let the incident pass. The witness nevertheless never forgot the remark or the circumstances in which it was made.

97. Once inside, Hajdini ignored every limit Mr. Rana had set. She grabbed him suddenly, forcibly kissed him and licked his face, and ordered him to suck her toes, repeating that she would facilitate his promotion and bonus, which Mr. Rana understood as a threat to block both if he refused. She taunted him: "Come on, you know you lowkey love that I own you." Then she explained the rules as she understood them: "It's all about keeping the seniors fat and happy… I've even had to suck some d**k to get where I am. It's just the way it works."

98. Long before any lawyers became involved, and while the abuse was still ongoing, Mr. Rana separately confided in this same witness that a woman from work was sexually harassing him, attempting to blackmail him, and making his life "hell." When asked whom he meant, he identified Hajdini from her LinkedIn photograph. This disclosure occurred months before Mr. Rana retained counsel or commenced this action.

99. A third independent witness likewise encountered Mr. Rana and Hajdini together outside the workplace. The witness observed them walking alone together before unexpectedly running into Mr. Rana on the street. Caught off guard, Mr. Rana introduced Hajdini to the witness. The encounter further corroborates Hajdini's repeated pursuit of Mr. Rana outside the workplace.

100. Hajdini acted with complete confidence that she would never be held accountable. She repeatedly behaved as though no one would ever believe that a male subordinate could be sexually coerced by his female supervisor. That belief emboldened her to threaten, blackmail, racially degrade, sexually assault, and repeatedly proclaim that she "owned" Mr. Rana, secure in the belief that if he reported her, he, not she, would be the one disbelieved.

101. That same impunity surfaced in writing, in front of the entire team. In a preserved group-chat message, Hajdini openly sexualized a member of the Leveraged Finance team, mocking his "*thirstrap [sic] mirror selfie flexing his abs*" and his private dating-application activity for the group's amusement. The message was flagrantly inappropriate. A supervisor was commenting on a colleague's body and private sexual life, in writing, in JPMorgan's own systems, to an audience of coworkers. Hajdini sent it without hesitation because she knew there would be no consequences. There were none:




*Group-chat message from Defendant Hajdini.*

**The Manhattan District Attorney's Office Opens a Criminal Investigation into Hajdini's Conduct.**

102. Independent governmental authorities treated the allegations against Hajdini with the seriousness they warranted. The Manhattan District Attorney's Office, through its Intimate Partner and Sexual Violence Bureau, opened a criminal investigation into the conduct alleged herein and assigned personnel to provide victim-services support to Mr. Rana.

103. As part of that investigation, representatives of the Manhattan District Attorney's Office, including ADA Jamie Cliff, Esq., communicated directly with Mr. Rana and his counsel, gathered evidence concerning Hajdini's conduct, and undertook investigative steps to corroborate the allegations. The State of New York also admitted Mr. Rana into its "Address Confidentiality Program" to protect his safety and location.

104. The criminal investigation remained active for months. Among other investigative measures, the Manhattan District Attorney's Office issued subpoenas seeking to identify the source of the anonymous threats directed at Mr. Rana and his family. The repeated delays in the returns on those subpoenas, and JPMorgan's conduct with respect to them, are detailed below.

105. The involvement of these independent governmental authorities began many months before this lawsuit was filed and was not undertaken in anticipation of litigation. Rather, it arose from the allegations themselves and the ongoing threats directed at Mr. Rana and his family.

106. Hajdini's sexual abuse did not occur in isolation. It arose within the same workplace culture that openly tolerated racial discrimination, empowered abusive supervisors, and punished employees who refused to remain silent.

**Defendants Stripped Mr. Rana of His Name and Reduced Him to a Racial Caricature.**

107. Hajdini never separated the sexual abuse from the racial abuse. She repeatedly coupled the two, reminding Mr. Rana that she "owned" him while degrading him with racial epithets, including "Brownie" and "Brown Boy." Race became another instrument of domination. Facing the personal and professional destruction she repeatedly threatened, Mr. Rana endured conduct to which he never consented, leaving him with profound psychological trauma.

108. The racial abuse of Mr. Rana ran through the same supervisory power structure that Hajdini exploited. From virtually the outset of his employment, the supervisors and colleagues responsible for his assignments, his evaluations, and his compensation refused to speak of him by his name. Within the team, Mr. Rana was addressed and referred to as ***"Brown Boy," "Brownie," "monkey," and "Boy,"*** and was mocked as the colleague who paid for things in ***"rupees."***

109. The epithets came from every level of the team. Graffeo, the Managing Director who led the group, used them. Hajdini, Mr. Rana's direct supervisor, used them, including while sexually assaulting him, as alleged above. Wolter, Vice Presidents, and Associates used them openly, in group settings and in writing. Because the abuse came from and was condoned by the very supervisors who evaluated Mr. Rana's performance, assigned his work, determined his compensation, and shaped his career, every slur carried the authority of JPMorgan's management.

110. Mr. Rana was the only non-white, non-Christian banker on the team, a fact apparent from the team roster image reproduced above in the Preliminary Statement. The target of the epithets was therefore unmistakable to everyone on the team.

111. The team memorialized its contempt in JPMorgan's own communications systems. As reflected in the messages reproduced in the Preliminary Statement, team members referred to Mr. Rana as the "***other Brown Boy***," mocked a Nepalese business by joking that it would "probably accept your rupees Chirayu," and joked about "$7,000,000 rupees" and "Venmo for

rupees." These were not stray remarks. They were calculated racial taunts, circulated to the entire team in JPMorgan's own systems, that reduced Mr. Rana to a crude ethnic stereotype.

112. The slurs followed Mr. Rana wherever the team gathered. At the team's September 2024 offsite, when Mr. Rana asked Graffeo whether the scheduled meetings had assigned seats, Graffeo answered, "***Yeah, yours is outside, Brown boy***," then mouthed "Brown boy" to Crowe, who laughed in response. Publicly reducing Mr. Rana to a racial epithet had become an accepted part of the team's interactions.

113. The team's members described the degradation as exactly what it was: collective practice. Speaking to a group of JPMorgan colleagues and third-party witnesses outside the office, Goodrich stated matter-of-factly, "***we all call him Brown Boy at the office***."

114. Hajdini repeatedly told Mr. Rana that the discrimination reflected the preferences of JPMorgan's leadership. She explained that Droogan and Graffeo wanted to "***keep it white and Christian,***" wanted to "make sure we keep the firm ***strong and white***," and favored people who "look like Jamie Dimon." She mocked the notion that leadership would ever permit "some Nepali Brown boy" to lead the team's originations business. Crowe likewise told Mr. Rana that Graffeo wanted to keep the team white and Christian.

115. Hajdini's account of leadership's animus was chillingly specific. She told Mr. Rana: "***Jay is tired of all these fucking Asians and Indians taking up space,*** especially on the Strategy side. Leadership on the IB side will remain white… JPM loves their white boys and Christian leaders."

116. Graffeo's own stated motive confirmed what the epithets conveyed. Hajdini told Mr. Rana on multiple occasions that Graffeo had told her that the only reason he hired Mr. Rana was that he needed a "Brown guy" on the team, and that Mr. Rana's hiring was merely part of the

"point system" internally at JPMorgan. In Graffeo's own telling, relayed to Mr. Rana by his own supervisor, the team's highest-producing banker was nothing more than a diversity quota.

117. Crowe put the team's contempt into words on July 18, 2024, when she called Mr. Rana an "***HR liability***." The remark was as revealing as it was offensive: the team's only non-white banker was regarded not as a colleague but as a "liability" to be managed.

118. By referring to Plaintiff in this way, Crowe knew she had crossed a line. Later that same day, she messaged Mr. Rana over JPMorgan's internal Microsoft Teams platform that she "was just joking around fyi ***didnt mean to upset you***." Mr. Rana has preserved that exchange, which is reproduced below:




*July 18, 2024 messages to Mr. Rana.*

119. Most damning of all, when Mr. Rana reported a colleague's incompetence together with serious compliance and material non-public information violations, senior Leveraged Finance leadership did not investigate. Instead, consistent with the directive given to Ms. Hajdini, "***just keep that damn monkey busy so he keeps quiet***," leadership focused on silencing Mr. Rana rather than addressing the misconduct he reported. They investigated nothing, disciplined no one, and took no action to address the reported violations.

**The Team's Bigotry Extended Beyond Mr. Rana.**

120. Defendants' bigotry extended beyond Mr. Rana. On Juneteenth, 2024, Goodrich referred to Black Americans as ***"Blackies,"*** mocked the holiday, remarked that they had already been "***allowed their own holiday***," that they "already had MLK Day," and then, laughing derisively, asked, "***How much more do they want? Equal rights?***" During the September 2024 offsite gathering, Graffeo referred to an Asian man near the team as ***"Mr. Miyagi"*** and ***"Mr. Chow."*** On another occasion, Goodrich referred to Mr. Rana and other employees of color as ***"knuckle draggers,"*** openly, in the presence of other team members, and without any consequence from JPMorgan management.

121. Goodrich's bigotry extended beyond race. After Mr. Rana introduced him to a woman he believed Goodrich would like, Goodrich expressed immediate interest after seeing her photographs. The moment Mr. Rana told him that she was Jewish, Goodrich's interest vanished. "Well I am not Jewish so…," he dismissively responded, making it unmistakably clear that, in his view, being Jewish, standing alone, was a disqualifier.

122. Mr. Rana challenged Goodrich, asking whether he was truly refusing to meet her simply because she was Jewish. Goodrich did not retreat from his position or deny what he had said. Instead, he instructed Mr. Rana to fabricate a false explanation that he simply was not interested based on her pictures, warning him to keep the real reason quiet because there were too many women in the office.




123. When Mr. Rana objected to the discrimination, Defendants did not investigate it or discipline those responsible. They marginalized Mr. Rana, dismissed his complaints, and allowed the abuse to continue. Every ignored complaint and every unpunished racial slur reinforced the message that racism at JPMorgan would carry no consequences.

124. By the end of Mr. Rana's employment, the discrimination had become institutionalized. It was reinforced by senior management, repeated by junior employees, ignored by Human Resources, and tolerated at every level of the organization. Through their actions and deliberate inaction, Defendants transformed the TMT Leveraged Finance group into a workplace permeated by racial hostility, humiliation, and intimidation.

125. The foregoing conduct, together with the additional racially hostile acts alleged throughout this Complaint, was severe and pervasive. It was directed at Mr. Rana because of his race, color, ancestry, and national origin, and altered the terms, conditions, and privileges of his employment by creating an objectively and subjectively hostile work environment.

126. The discrimination did not end with words. It infected virtually every aspect of Mr. Rana's employment, including the resources he received, the evaluations he was given, the credit he earned, the compensation he was paid, and the privileges afforded to his white colleagues.

**JPMorgan Treated Mr. Rana Worse Than His White Peers.**

127. JPMorgan rewarded Mr. Rana's superior performance with inferior treatment. As alleged above, despite generating more business than either Goodrich or Gray, Mr. Rana was assigned only one support employee while each of his white Vice-President peers received three support employees. At the September 2024 offsite, Graffeo and Gray underscored their contempt by walking out in the middle of Mr. Rana's presentation.

128. Defendants likewise manipulated the performance evaluation process to favor Mr. Rana's white peers. For 2024, Graffeo rated Mr. Rana merely "OOO" (On Track) while awarding the less accomplished Goodrich and Gray "SOO" (Strong), despite Goodrich's submission of an error form for a critical mistake. Graffeo then stripped Mr. Rana of credit for sponsor introductions that matured into lucrative transactions and transferred both the credit and the accompanying compensation to his white colleagues.

129. The double standard extended to workplace flexibility. JPMorgan permitted Norris to work full-time from Charlotte, Gray from Los Angeles, and Graffeo from Nashville, each outside New York. Yet when Mr. Rana sought the modest accommodation of working temporarily

from a nearby office while caring for his seriously injured mother, JPMorgan refused and ordered him back to New York. The details of that discriminatory denial are set forth below.

**JPMorgan Deliberately Interfered with Mr. Rana's FMLA Rights and Refused to Restore Him.**

130. In or about November 2024, Plaintiff's mother, who lived in Virginia, was suffering from a serious health condition. Mr. Rana went to her home to care for her and needed to remain in the Washington, D.C. area. He asked Defendants JPMorgan, Graffeo, and Wolter for a simple accommodation: permission to work temporarily from JPMorgan's Mid-Atlantic office for the first half of 2025 while remaining available to his mother.

131. The request imposed no hardship whatsoever. JPMorgan routinely permitted employees to work from offices in Charlotte, Los Angeles, Nashville, and elsewhere around the country. Yet when Mr. Rana sought the same flexibility to care for his seriously injured mother, Defendants refused. They offered no legitimate business reason for doing so.

132. Graffeo and Wolter made him choose between his mother and his career. They first sent Mr. Rana to JPMorgan's Washington, D.C. office, then claimed, falsely, that the office had no room for him, and finally ordered him back to New York, hundreds of miles from the mother he was trying to care for.

133. The demand served no business need; it was an exercise of control. It forced Mr. Rana to choose between the parent who needed him and the job he excelled at, and it cut short the family and medical leave the law guaranteed him. JPMorgan's interference with that FMLA-qualifying caregiving leave was knowing and willful, and it was a preview of how the Firm would treat the formal leave it was about to approve.

134. By letter dated May 5, 2025, JPMorgan, through its leave administrator Sedgwick Claims Management Services, Inc., formally approved twelve weeks of leave under the Family

and Medical Leave Act, from March 4 through May 26, 2025, for the express purpose of "the need to care for ***[his] Mother due to [her] serious health condition***" (Case No. 4A25032GB7C0001GI). It approved the identical leave under New York Paid Family Leave for the same period. JPMorgan knew exactly why Mr. Rana was out: he was caring for his seriously injured mother, and the Firm had approved that leave in writing.

135. In approving and designating that leave under the FMLA, JPMorgan admitted on its own paper that Mr. Rana was an eligible employee under 29 U.S.C. § 2611(2), that his mother's condition was a serious health condition, and that Mr. Rana was entitled to job-protected leave and to restoration to the same or an equivalent position the moment he returned.

136. JPMorgan established May 27, 2025, as Mr. Rana's return date. Its approval identified only one circumstance under which Mr. Rana's pay or system access could be interrupted: if he failed to confirm his return with both Sedgwick and his manager.

137. Mr. Rana did exactly what JPMorgan required. He timely confirmed his return with both Sedgwick and his manager and returned to work on May 27, 2025. He complied with every condition JPMorgan imposed.

138. JPMorgan did not. Even while Mr. Rana remained on approved leave, Defendants twice changed his employment status to "unpaid" without warning, justification, or legal basis.

139. Most significantly, when Mr. Rana returned from protected leave, JPMorgan refused to restore him to the position the FMLA guaranteed. Instead, it stopped paying him, disabled his system access, and denied him the restoration its own approval letter promised. Mr. Rana honored every obligation imposed upon him. JPMorgan honored none of its own.

140. By obstructing Mr. Rana's protected leave, interfering with his exercise of FMLA rights, and refusing to restore him to the same or an equivalent position upon his return, Defendants violated the FMLA.

141. Mr. Rana exercised rights protected by the FMLA by requesting and taking approved leave to care for his seriously injured mother. Defendants knew he had engaged in protected activity because they approved the leave themselves.

142. Mr. Rana returned from leave exactly when JPMorgan instructed. He confirmed his return with Sedgwick and his manager and fully complied with every condition Defendants imposed.

**JPMorgan Launches a Flagrant Campaign of Retaliation Against Mr. Rana for Reporting Discrimination and Sexual Abuse.**

143. On May 20, 2025, while still on approved FMLA leave, Mr. Rana exercised another protected right. Through counsel, he served JPMorgan with a detailed written complaint accusing Graffeo, Wolter, Hajdini, and others of pervasive racial discrimination, a racially hostile work environment, retaliation, and Hajdini's ongoing harassment, blackmail, sexual coercion, sexual assault, and abuse of supervisory authority.

144. The complaint left JPMorgan with no room to claim ignorance. It identified the perpetrators by name, described their misconduct in painstaking detail, advised that the allegations were corroborated by documentary evidence and witness testimony, demanded that JPMorgan immediately investigate the misconduct, preserve all relevant evidence, and stop the ongoing violations of law, and warned the Firm of the substantial legal consequences of failing to do so.

145. By that time, Mr. Rana had already been receiving mental-health treatment for months as a direct result of Defendants' conduct and would later be diagnosed with post-traumatic stress disorder. JPMorgan therefore knew not only of the misconduct, but of the profound harm it

had already inflicted. It nevertheless refused to investigate the wrongdoing. Instead, it protected the wrongdoers, abandoned the victim, and immediately weaponized the institutional power of the Firm against the employee who had the courage to report them.

**JPMorgan Employees Learn of the Complaint and Subject Mr. Rana and His Family to a Campaign of Racist Threats.**

146. JPMorgan answered Mr. Rana's discrimination complaint not by protecting him, but by exposing him. Within days of his protected complaint, Mr. Rana became the target of a sustained campaign of anonymous racist threats that echoed the very slurs used inside his JPMorgan group and unmistakably referenced his decision to report the discrimination. On June 5, 2025, an anonymous caller warned him, ***"just wait 'till you're back in New York, Brown boy... just wait,"*** and called him a ***"snitch,"*** directly tying the threat to his protected complaint.

147. The threats quickly escalated. On June 9, 2025, an anonymous voicemail, purporting to come from a JPMorgan manager, told Mr. Rana in racially derogatory terms that he did not belong at the Firm because of his race and national origin and would never be permitted to transfer to another position. Four days later, on June 13, 2025, another anonymous voicemail subjected him to additional racial slurs and threatened his physical safety, warning him to "watch [his] back."

148. The campaign did not stop with Mr. Rana. It spread to his family. Later that summer, on or about September 9, 2025, Mr. Rana, his partner, and another member of his family received a series of threatening text messages from a telephone number that Mr. Rana preserved together with its originating metadata. The messages called Mr. Rana a "***brown piece of shit,"*** threatened to destroy his career, and warned his family, "***RUN BEFORE WE CALL ICEE [sic] ON YOUR FAMILY***."




*September 9, 2025 threatening text messages sent to Mr. Rana and his family.*

149. The messages revealed knowledge that was not publicly available. They repeated the very racial epithets used inside Mr. Rana's JPMorgan group, including "Brown Boy." They mocked the Nepali heritage his coworkers had ridiculed, telling him to ***"go back"*** and to ***"burn***

***down just like Nepal."*** They branded Mr. Rana a "snitch" for reporting discrimination. They warned that the senders knew where his family lived. They parroted Hajdini's signature refrain, taunting Mr. Rana, "What did I tell you? We own your ass," and telling him, "No one will ever believe you," the very words Hajdini had used for months to control him. And they referenced his confidential discrimination complaint, a complaint known only to JPMorgan and the employees he had accused.

150. The source of the threats was unmistakable. They reflected insider knowledge unavailable to the public. No outsider knew that Mr. Rana had been repeatedly called "Brown Boy" inside JPMorgan. No outsider knew that his coworkers had mocked his Nepali heritage or taunted him to "go back" to Nepal. No outsider knew that Mr. Rana had submitted a confidential complaint accusing specific JPMorgan employees of racial discrimination.

151. The threats recycled those same slurs, invoked that same heritage, branded Mr. Rana a "snitch" for reporting the discrimination, and drew upon information known only within his JPMorgan group. The only reasonable inference is that the threats originated from one or more individuals within that group or from someone acting on information obtained from them.

152. The epithets themselves bore the team's signature. "Brown" and "Brown boy" were not generic insults. They were the specific terms of degradation used inside Mr. Rana's own Leveraged Finance team, in its group chats, at its offsites, and to his face. No one outside that team was privy to that vocabulary or to its use against Mr. Rana. A stranger would have had no way of knowing that those particular words carried that particular sting. The authors of the threats did.

153. The references to Nepal point to the same source. Mr. Rana's Nepali heritage was not public knowledge. No one outside his immediate team knew that he came from a Nepali family, and no one but his JPMorgan teammates had mocked that heritage. The threats also reached Mr.

Rana directly on his personal cell phone, a number he never made public and that, apart from his family and close friends, only members of his team possessed. The epithets, the references to Nepal, and the use of his personal cell phone number all point to one place: the JPMorgan team Mr. Rana worked with every day.

**JPMorgan Immediately Begins Dismantling Mr. Rana's Career as Soon as He Returns from FMLA Leave.**

154. Mr. Rana returned to work on May 27, 2025. The retaliation began the moment he walked back through JPMorgan's doors. Defendants stripped him of the analyst and associate support on which his production depended, and for approximately two weeks his incoming email was automatically diverted into his deleted-items folder, cutting him off from communications essential to his work and sabotaging his ability to perform. As reflected in the email below, dated June 2, 2025, Mr. Rana promptly notified Wolter that he had been stripped of the analyst and associate support necessary to execute his deals and requested that the issue be corrected. The email documents Defendants' deliberate refusal to provide him with the resources required to perform his job:



19:27

Re: [EXTERNAL]Term, Revolver Loan - M&A Transaction

RC You
chirayu.rana@jpmorgan.com
To: Wolter, Jonathan (CIB, USA)
jonathan.wolter@jpmorgan.com
Monday, June 2, 15:45

Hi Jon,

Thanks again for the opportunity to work on this deal—I'm looking forward to getting started and working with you again.

That said, I want to flag that I'm currently the only person from our group staffed on this below MD. Given the nature of the transaction—and how we've staffed similar deals for Cameron and Tom—I think it's important to add an Associate and Analyst now rather than later. This will help ensure full coverage and avoid potential execution issues, particularly around Dealworks, which I haven't used before. Credit also has an Associate staffed (Chandel Queenan), which reinforces the need for parallel support on our side.

From a development and workflow standpoint, this would also allow me to focus on high-level execution and oversight, in line with my year-end feedback.




*June 2, 2025 email from Mr. Rana to Defendant Jon Wolter regarding deal staffing (shown in two parts).*

155. On June 5, 2025, Mr. Rana sent Crowe a measured email, copied to Wolter, concerning a client deliverable she had repeatedly failed to complete despite ample time and multiple reminders. In the same email, he asked that their work be ***"grounded in equity,"*** that "***cultural, ethnic, and/or personal differences***" not become "barriers" to their work, that he be

treated "***fairly and equally***" as Goodrich and Gray, and that he be respected "as an equal human being despite any perceived cultural and/or ethnic differences" over which he had "no control."

156. Wolter did not address a single allegation of discrimination. Instead, he attacked the employee who reported it. He reprimanded Mr. Rana for speaking up, declared that his email was *"not an appropriate or acceptable way"* to provide feedback, and recast Mr. Rana's protected complaint of racial discrimination as a performance failing of his own.

157. Rather than investigate the detailed allegations of racial discrimination that had been reported directly to him, Wolter cavalierly dismissed them. He offered the hollow assurance that "the firm takes these concerns seriously," then directed Mr. Rana to call the Code of Conduct hotline at "1-855-JPMCODE," reducing detailed allegations of racial discrimination by his own subordinate to little more than a customer-service referral. The assurance was empty, and his conduct proved it. Wolter initiated no investigation, interviewed no witnesses, took no corrective action, stopped none of the discrimination, protected no victim, and held none of the perpetrators accountable.

158. Human Resources fared no better. It responded only that it had "passed these concerns on to Employee Relations." It conducted no meaningful investigation, took no corrective action, and left every accused wrongdoer exactly where they were. By their actions, Wolter and Human Resources ratified the discrimination Mr. Rana had reported and immediately shifted their attention to retaliating against the employee who exposed it. The message could not have been clearer: at JPMorgan, complaining about race discrimination was unacceptable. The discrimination itself was not.

**JPMorgan Flagrantly Retaliates Against Mr. Rana While Protecting the Wrongdoers.**

159. On June 6, 2025, just sixteen days after receiving Mr. Rana's detailed complaint of racial discrimination, sexual harassment, and sexual assault, JPMorgan blatantly escalated its retaliation. Rather than remove the employees accused of serious misconduct, it summarily removed the employee who had reported them.

160. During a recorded telephone call that same day, Paul, a Partner in JPMorgan's Employee Relations group, informed Mr. Rana that JPMorgan had decided to place him on paid administrative leave, effective immediately. Paul confirmed that JPMorgan had received Mr. Rana's attorney's demand letter and understood that it alleged race discrimination, national origin discrimination, sexual assault, and sexual harassment.

161. Mr. Rana repeatedly asked why. Paul refused to provide a reason. When Mr. Rana asked, *"Did I do something wrong?"* Paul answered, ***"No, we're not saying that at all."*** When Mr. Rana complained that the decision *"seems a bit retaliatory,"* since it followed right after he had "*flagged some concerns*," Paul responded only, "I think [we'll] get into more of that with you next week." And when Mr. Rana asked whether he was being placed on leave "because of the concerns I raised," Paul would not deny it, stating only, "Given the investigation, we would like to speak with you next week."

162. Paul never identified any misconduct by Mr. Rana, any policy violation, any legitimate basis for removing him from the workplace, or any meaningful end date, saying only that the leave would continue until JPMorgan decided to speak with him. JPMorgan suspended the whistleblower.

163. Mr. Rana repeatedly asked for an explanation. He reminded Paul that he had uprooted his life and signed a New York lease at JPMorgan's request, had just returned from

approved FMLA leave, and had numerous client meetings already scheduled. He explained that the decision would inflict immediate and lasting damage on his career. Paul remained unmoved.

164. The decision had already been made before Mr. Rana was ever interviewed. JPMorgan first suspended him. Only afterward did it announce that it wanted to interview him about the very misconduct he had reported. The punishment came first. The investigation was little more than an after-the-fact justification.

165. Four days later, on June 10, 2025, Mr. Rana's counsel objected in writing to JPMorgan's Legal Department that JPMorgan could not credibly "investigate its own retaliatory decision" to place Mr. Rana on administrative leave. Counsel also placed the Firm on formal written notice of its preservation obligations, reporting reason to believe that members of Mr. Rana's own team "have deleted emails from their own and his email accounts." From that date forward, JPMorgan had documentary notice of both its preservation obligations and the reported destruction of evidence.

166. JPMorgan's message could not have been clearer: report senior JPMorgan executives for racial discrimination and sexual harassment, and you, not they, would be removed from the workplace. The Firm weaponized the very investigative process that was supposed to protect victims and instead used it to punish one. It was the same directive senior leadership had issued once before, now executed on an institutional scale: "***just keep that damn monkey busy so he keeps quiet***."

**JPMorgan Exiles Mr. Rana While Protecting Those He Reported.**

167. JPMorgan then completely removed Mr. Rana from the Firm. Paul ordered him to log off every JPMorgan system immediately. His building access was revoked. He was barred from every JPMorgan office. He was prohibited from sending emails or instant messages,

forbidden from communicating with colleagues through Firm systems, instructed to abandon active client matters, and directed not to hold himself out as a JPMorgan employee. Overnight, JPMorgan severed Mr. Rana from his clients, colleagues, counterparties, and the professional relationships he had spent years building.

168. Mr. Rana asked whether he alone had been removed from the workplace or whether the same action had been taken against the employees he had accused. Paul refused to answer, claiming JPMorgan would not disclose the scope of its investigation or whether anyone else had been placed on leave.

169. The answer was unmistakable. Hajdini remained at work. Graffeo remained at work. Wolter remained at work. None lost access to JPMorgan's systems. None were removed from client responsibilities. None were barred from JPMorgan's offices. None were isolated from the workplace. JPMorgan reserved those extraordinary and punitive measures for one person, and one person alone: the employee who had reported racial discrimination, sexual harassment, and sexual assault. At JPMorgan, the price of reporting discrimination was paid by the victim, not the perpetrators.

**JPMorgan Enables the Threats and Obstructs the Criminal Investigation.**

170. The campaign of threats against Mr. Rana and his family was not random. It was the foreseeable product of JPMorgan's own decisions. The Firm disclosed Mr. Rana's complaint to the very employees he had accused, left those employees in the workplace with continued access to Mr. Rana's personal information, and removed only Mr. Rana from the workplace.

171. JPMorgan possessed every means to investigate the threats, preserve the electronic evidence, identify those responsible for sending the threats, and protect Mr. Rana and his family. It did none of those things. Instead, it left the threats unanswered, the perpetrators untouched, and

Mr. Rana and his family to endure the consequences while protecting the very employees whose conduct had precipitated the campaign.

172. JPMorgan has also engaged in a pattern of obstruction and delay with respect to the lawful third-party subpoenas issued in the criminal investigation described above. On October 24, 2025, the assigned Assistant District Attorney reported that subpoena returns expected within two weeks had not yet been received. On November 12, 2025, the same Assistant District Attorney reported "**further delays on subpoena returns**," moving the investigation's timeline toward December 2025. By letter dated September 16, 2025, Mr. Rana's counsel had already placed JPMorgan's outside counsel on written notice that JPMorgan was in a far better position than Mr. Rana to determine the source of the threatening messages, and had criticized JPMorgan's lack of concern. JPMorgan's posture toward the criminal investigation of threats made against its own employee and his family stands in stark contrast to its public insistence that Mr. Rana failed to cooperate with its internal review.

**Defendants Wage a Deliberate Campaign to Isolate Mr. Rana and Dismantle His Career.**

173. Removing Mr. Rana from the workplace was only the beginning. Rather than investigate the misconduct he had reported or restore him to his position, JPMorgan intensified its retaliation in the weeks and months that followed. It continued isolating him, manipulating his employment conditions, interfering with his compensation, and systematically dismantling the career he had spent years building.

174. Acting at Graffeo's direction, Wolter orchestrated Mr. Rana's professional isolation. He actively blocked the transmission of Mr. Rana's emails to other JPMorgan departments and external clients, instructed lending partners and other personnel not to communicate directly with him, and directed colleagues to withhold information from him.

175. Mr. Rana quickly confirmed the campaign for himself. On a transaction involving the company Nerdio, a Vice President in JPMorgan's San Francisco technology investment banking group, with whom Mr. Rana had developed a strong working relationship, abruptly ceased communicating with him after Wolter learned of the deal. The banker later asked Mr. Rana whether he was leaving the Firm and disclosed that Wolter had instructed him not to coordinate directly with Mr. Rana.

176. On another occasion, after Mr. Rana contacted a relative employed by JPMorgan, Wolter confronted him about the communication, making plain that he was monitoring Mr. Rana's communications. Mr. Rana was informed that this campaign was carried out and recorded on JPMorgan's own systems.

177. In short, Defendants systematically cut Mr. Rana off from the people, information, opportunities, deal flow, counterparties, and internal relationships that had made him one of the Firm's highest-producing bankers, while leaving him to bear the blame when transactions stalled.

**Defendants Escalate Their Retaliation by Deliberately Slashing Mr. Rana's Pay.**

178. Defendants next targeted Mr. Rana's livelihood. Beginning in or about April 2025 and continuing thereafter, JPMorgan subjected Mr. Rana's compensation to a sustained pattern of unauthorized deductions, withholdings, and pay irregularities, including irregular net pay across multiple pay periods, recurring retroactive offsets labeled "Leave of Absence" without documentation or any approved leave authorization, inconsistent year-to-date taxable income reporting, and unilateral pay-period reclassifications applied without notice or Mr. Rana's written authorization.

179. The pattern escalated dramatically at the end of June. On or about June 15, 2025, Mr. Rana received his regular biweekly net pay of approximately $8,420.99. Just two weeks later,

on June 30, 2025, JPMorgan slashed his paycheck by more than half, to approximately $3,277.91, without providing the advance written notice required by law or any explanation whatsoever.

180. Mr. Rana immediately objected. Within hours, he sent an urgent email referencing Human Resources Case No. W615514 and demanding confirmation that he remained on paid administrative leave. On July 2, 2025, JPMorgan's own leave administration team *admitted in writing* that payroll had failed to process his paid administrative leave correctly, acknowledged that retroactive paid leave hours had never been entered, and promised the missing wages would be wired that very day. They never were.

181. During a recorded telephone call on July 7, 2025, JPMorgan representatives again admitted that Mr. Rana's June 30 paycheck was wrong. Mr. Rana advised the Firm that New York law required written notice before reducing an employee's wages. Even after admitting the payroll error, JPMorgan refused to correct it. Instead, it knowingly continued withholding approximately $18,000 in compensation it knew Mr. Rana had earned. This was no clerical mistake. It was a deliberate continuation of the retaliation already underway.

182. On or about July 7, 2025, Mr. Rana also submitted a formal written request to JPMorgan Human Resources, Payroll, Employee Relations, and senior management seeking a full reconciliation of his compensation, a written explanation of the retroactive leave-related reversals, and confirmation that no further unauthorized adjustments were pending. JPMorgan provided none of it. Mr. Rana had escalated the compensation irregularities through every proper internal channel beginning in or about April and May 2025 and continuing through July 2025 and thereafter. JPMorgan never remediated them, never produced the documentation he requested, and never provided a reconciliation.

183. When Mr. Rana reported the payroll misconduct, Wolter answered with yet another threatening email. By then, Mr. Rana had reported racial discrimination, sexual abuse, payroll violations, and retaliation. Each time he invoked his legal rights, Defendants answered with another act of retaliation. The pattern was unmistakable.

**JPMorgan Casts Mr. Rana Aside and Leaves Him Twisting in the Wind for Several Months.**

184. For the next four months, JPMorgan kept Plaintiff on involuntary administrative leave, investigating nothing, correcting nothing, and restoring nothing. It made no meaningful effort to resolve his complaints, return him to work, or repair the damage it had inflicted.

185. Instead, JPMorgan left Mr. Rana professionally isolated and twisting in the wind. It cut him off from the clients, colleagues, counterparties, and industry relationships on which his career depended while the damage to his reputation, livelihood, financial security, and emotional well-being compounded with each passing week.

186. By then, JPMorgan had made its choice. It chose to protect the wrongdoers rather than the man who reported them. It chose retaliation over accountability. It chose to sacrifice the whistleblower rather than confront the discrimination and abuse festering within its own ranks.

**JPMorgan Constructively Discharges Mr. Rana.**

187. By the fall of 2025, JPMorgan had made Mr. Rana's continued employment impossible. For more than four months, it kept him on indefinite involuntary administrative leave with no end date, no meaningful investigation, and no intention of restoring him to his position. Every employee he had accused remained at work. Only Mr. Rana was removed.

188. JPMorgan stripped Mr. Rana of his systems access. It cut him off from his clients, counterparties, and colleagues. It withheld compensation it knew it owed him. It left him professionally isolated while his reputation deteriorated in the marketplace.

189. Even after Mr. Rana and his family became the targets of racist threats, JPMorgan did nothing to identify those responsible or protect them. It claimed it could not identify the source of the threatening calls and text messages, and it made clear it would do nothing further to protect Mr. Rana from threats of retaliation.

190. JPMorgan's investigation ended the way it had begun: protecting the Firm. JPMorgan told Mr. Rana that it "could not substantiate" his claims, notwithstanding the considerable supporting evidence of the harassment and sexual assaults he had provided.

191. This was no bureaucratic failure. It was a deliberate campaign of attrition. Rather than terminate Mr. Rana outright, JPMorgan made his working conditions so intolerable that any reasonable employee would have concluded there was no future for him at the Firm.

192. Every step served the same objective: isolate Mr. Rana, destroy his professional standing, and force him to leave on JPMorgan's terms while shielding the employees he had accused from any accountability.

193. Mr. Rana did not resign to pursue a better opportunity. He resigned because JPMorgan left him no future. He began seeking alternative employment only after months of indefinite involuntary leave, with no end date, no investigation, and no restoration in sight, made plain that JPMorgan would never return him to his position. No reasonable employee in his circumstances would have concluded otherwise or waited longer.

194. Mr. Rana's contemporaneous resignation letter recorded exactly why he was leaving. It stated that JPMorgan had expressed no intent to allow him to return to work despite four months of involuntary leave following his complaints of "sexual assault, race discrimination, and retaliation." He wrote: "My discrimination and harassment and safety concerns (among others) remain unaddressed, which has been extremely detrimental to my personal health, safety, and well-

being and general professional growth. I have also faced continued retaliation from my harassers in the form of threatening voicemails and text messages." Citing "the ongoing safety concerns and potential acts of violence toward myself, my family, and my loved ones," he concluded that he had "no other choice but to resign at this time."

195. On October 14, 2025, with no reasonable alternative remaining, Mr. Rana resigned, effective October 17, 2025. His resignation was compelled by JPMorgan's unlawful conduct and was the foreseeable and intended consequence of its campaign of discrimination and retaliation. Having failed to silence Mr. Rana, JPMorgan drove him out.

**JPMorgan Maliciously Blacklists Mr. Rana Within the Financial Industry.**

196. Hajdini had long made clear exactly what she intended to do. She had warned Mr. Rana to "***be careful in this industry—you never know who you will overlap with.***" She also told him, "You think I'm going to let you go that easily?" Those were not idle threats.

197. Acting together with Graffeo and Wolter, Hajdini began carrying out those threats by poisoning Mr. Rana's opportunities elsewhere and preventing him from escaping the abusive environment they had created.

198. By way of example, in or about January 2025, Mr. Rana had advanced to the final round for a private-credit position at a global investment firm after being referred by a senior industry contact. That opportunity abruptly vanished after the prospective employer sought an informal reference from JPMorgan.

199. Hajdini responded by giving Mr. Rana an aggressively negative reference and falsely telling the prospective employer that Mr. Rana was unqualified. Two other promising employment opportunities similarly vanished after prospective employers sought references from JPMorgan.

200. JPMorgan's retaliation did not end with Mr. Rana's resignation. Having forced him from the Firm, Defendants escalated their misconduct by maliciously seeking to ensure that he could not rebuild his career elsewhere.

201. As detailed below, Defendants falsely told prospective employers and others within the financial industry that Mr. Rana had been fired, poisoning his professional reputation and sabotaging his efforts to obtain comparable employment.

202. Defendants also weaponized Mr. Rana's confidential sexual-harassment complaint. In a flagrant violation of the confidentiality they were obligated to maintain, they wrongfully disclosed the complaint to prospective employers and others within the financial industry, further poisoning Mr. Rana's reputation and undermining his ability to secure comparable employment.

203. After Mr. Rana resigned, Defendants made good on Hajdini's threats. They did not merely interfere with his search for new employment. They embarked on a deliberate campaign to blacklist Mr. Rana within the financial industry. Their objective was no longer simply to force him out of JPMorgan. It was to ensure that, wherever Mr. Rana landed next, they would destroy that opportunity as well.

**Defendants Set Out to Destroy Mr. Rana's New Employment and Future Career.**

204. Despite Defendants' relentless campaign to sabotage Mr. Rana's career, he rebuilt it anyway. On or about October 20, 2025, Mr. Rana joined Bregal Sagemount as a Principal in its Private Credit Group in a position with total potential annual compensation of approximately $2.5 million. He quickly became the top producer on the credit team, sourcing approximately $3 billion across twenty-five transactions.

205. JPMorgan, Graffeo, and Wolter set out to destroy that success as well. Beginning in or about December 2025 and continuing thereafter, they embarked on a sustained campaign to poison Mr. Rana's reputation throughout the private credit and leveraged finance markets.

206. Defendants falsely told market participants, financial institutions, prospective employers, and business counterparties that Mr. Rana had been fired from JPMorgan. They also falsely portrayed him as litigious, telling others that he was "suing" JPMorgan, including for sexual harassment, in an effort to brand him as a problematic employee whom sophisticated financial institutions should avoid. On or about December 12, 2025, JPMorgan personnel told one or more market participants that Mr. Rana had been "fired" from JPMorgan and was "suing" JPMorgan for sexual harassment. At that time, Mr. Rana had filed no lawsuit and no charge against anyone.

207. Defendants Graffeo and Wolter went further still. They falsely branded Mr. Rana a "*liar*," "*untrustworthy*," "*a moron*," and "*an idiot*" who "*does not understand credit*," told others that he had a "*poor reputation*" and that they "*cannot trust*" him, and falsely claimed that Plaintiff had been "*fired for cause*." These statements were made for the purpose of destroying Mr. Rana's professional credibility and discouraging others from hiring him or doing business with him.

208. Every one of those statements was false, and Defendants knew it. Mr. Rana was never fired from JPMorgan. He was placed on involuntary administrative leave and ultimately constructively discharged. His leave was approved by JPMorgan under the FMLA to care for his seriously injured mother. The attacks on his honesty, integrity, and professional conduct were equally false.

209. Defendants did not limit their efforts to rumor and innuendo. They also intervened directly to derail specific employment opportunities. JPMorgan moved against a prospective senior

position at Brookfield. Brookfield's Private Equity Chief Executive has confirmed JPMorgan's role in causing that opportunity to collapse.

210. Defendants' interference likewise extends to Mr. Rana's prospective employment and business opportunities throughout the industry, including but not limited to prospective opportunities with J.P. Morgan Asset Management (Private Credit), an affiliate of Defendant JPMorgan that Mr. Rana has been categorically foreclosed from joining, notwithstanding his documented origination record; with Bregal Sagemount as alleged herein; and with the investment firms and market participants whose personnel have received Defendants' false and disparaging characterizations of Mr. Rana.

**Defendants' Interference Reached Across the Private Credit and Leveraged Finance Markets.**

211. Defendants' campaign extended across the private credit and leveraged finance markets. To protect cooperating witnesses and third parties pending the entry of an appropriate protective order, the private equity and credit funds referenced below are identified as "PE Fund #1" through "PE Fund #15." Their identities are known to Mr. Rana and are preserved for disclosure in discovery.

212. In or about early 2026, a Partner at PE Fund #1, a firm with which JPMorgan personnel had a longstanding business relationship, advised Mr. Rana that JPMorgan was forwarding internal investment committee correspondence concerning Mr. Rana to PE Fund #1 in connection with a transaction involving one of PE Fund #1's portfolio companies. The conduct forced PE Fund #1 to explain to its own chief executive officer the disruption to its engagement with Mr. Rana. As a result, Mr. Rana was blocked from continuing to participate in the transaction, and the sponsor relationship was disrupted.

213. Hajdini, acting in concert with Graffeo, Wolter, and Droogan, also leaked falsified accounts of the matters alleged in this Complaint to an established West Coast private equity fund. A Senior Partner of that fund, with whom Mr. Rana has held a professional relationship spanning more than ten years, advised Mr. Rana in person, and confirmed in contemporaneous calls, text messages, and meetings that Mr. Rana has preserved, that JPMorgan personnel had been actively disseminating a defamatory account of the underlying matter for the express purpose of damaging Mr. Rana's credibility and standing in the market. That conduct continues to this day.

214. In or about early 2026, a Vice President at PE Fund #2 and a Vice President at PE Fund #3 separately advised Mr. Rana that JPMorgan personnel had been actively reaching out to their firms, making disparaging statements about Mr. Rana, and instructing senior personnel to cease sending him deal flow.

215. In or about early 2026, a Principal at PE Fund #4 advised Mr. Rana that JPMorgan had told PE Fund #4 that Mr. Rana had sued JPMorgan for sexual misconduct, that senior leadership had instructed the PE Fund #4 deal team to withhold information from Mr. Rana concerning a $100 million preferred-equity transaction that Mr. Rana had originated and executed, and that JPMorgan was working to block that transaction at the investment committee of Mr. Rana's then-current employer, Bregal Sagemount.

216. In or about early 2026, a Managing Director at PE Fund #5 advised Mr. Rana at an in-person meeting in San Francisco that he had been instructed by senior personnel at his firm and by other market participants to surreptitiously record his conversations with Mr. Rana in order to obtain information that could be used against him. The Managing Director further advised that JPMorgan had communicated that it would cease conducting business with PE Fund #5 for so long as the firm maintained any business relationship involving Mr. Rana.

217. In or about late 2025 and early 2026, senior investment professionals at additional financial sponsor firms, identified herein as PE Fund #6 through PE Fund #12, separately communicated to Mr. Rana information consistent with the same pattern: JPMorgan's contacts with their firms concerning Mr. Rana, JPMorgan's disparaging statements about him, and the resulting disruption of his business relationships and prospective transactions with those firms.

218. In or about March 1, 2026, a Partner at PE Fund #13 advised Mr. Rana that proprietary transactions Mr. Rana had originated directly through his own relationships with company chief executives and management teams were being actively hindered and blocked by JPMorgan. The Partner conveyed that JPMorgan personnel were telling market participants that Mr. Rana had been "fired" by JPMorgan and was in "active litigation" against the Firm. Those statements were false when made: Mr. Rana was never fired, and at that time he had commenced no lawsuit against anyone.

219. On or about February 20, 2026, a Managing Director at PE Fund #14 confirmed to Mr. Rana that JPMorgan had been communicating the existence of Mr. Rana's dispute with the Firm to market participants across Wall Street, including private equity firms, private credit funds, and other counterparties, and that Mr. Rana's then-current employer, Bregal Sagemount, had been made aware of it. That campaign, and the resulting damage to Mr. Rana's credibility and reputation in the market, continued through the termination of his employment at Bregal Sagemount on April 2, 2026.

220. The interference also operated through former JPMorgan personnel who had moved to other firms. Rich Saum, a former member of JPMorgan's Leveraged Finance group and now a Director at Francisco Partners, intentionally excluded Mr. Rana from financing transactions in which Mr. Rana would otherwise have participated, and did so at the instigation of, and in

coordination with, Hajdini and JPMorgan. As a direct result of this conduct and the conduct alleged above, Mr. Rana has suffered and continues to suffer economic damages, including lost compensation, lost transactions, and lost business opportunities, together with lasting injury to his professional standing and to his personal and professional reputation.

221. In or about the first quarter of 2026, the Co-Founder and Managing Partner of a middle-market private equity fund, with whom Mr. Rana has held a personal and professional relationship since high school, asked Mr. Rana to review three new platform buy-out opportunities that the firm intended to structure with modest senior leverage and preferred equity. After Mr. Rana entered the three transactions into the firm's pipeline systems, the Managing Partner received information concerning the pendency of Mr. Rana's legal matter against JPMorgan and was advised by other market participants not to work with "bad actors" in the space. The Managing Partner addressed the matter directly with Mr. Rana, corroborated JPMorgan's interference, and memorialized it in a contemporaneous text message that Mr. Rana has preserved. Mr. Rana was excluded from the three platform financings and from supporting the firm on its inaugural transaction as a newly formed fund.

222. The disparaging statements JPMorgan personnel spread through the market attacked every dimension of Mr. Rana's professional standing. They told market participants that Mr. Rana had never been a "real" investment banking analyst but a commercial banker who had misrepresented his experience and had never closed a sell-side or buy-side transaction; that he lacked "live deal experience," knew no one in the private equity community, and had no relationships capable of generating deal flow; and that he was a "lazy," "incompetent," "introvert" with limited upside as a senior industry professional. Every one of those statements was false.

223. Defendants' smears turned personal as well. JPMorgan personnel told market participants that Mr. Rana drank to excess three to four times per week, was not committed to his role, and was professionally unreliable. Those statements were all categorically false. They were also perverse: Defendants attributed to Mr. Rana the very misconduct, sexual exploitation and alcohol-fueled abuse, to which Hajdini had subjected him.

224. Current JPMorgan employees have corroborated the campaign. One, a tenured JPMorgan employee of more than ten years and a close family friend and distant relative of Mr. Rana, advised him that JPMorgan personnel had instructed the employee not to communicate with Mr. Rana on the ground that he had caused "insurmountable harm" to JPMorgan and was "untrustworthy" and "a liar." Another, employed in JPMorgan's Asset and Wealth Management Division, advised Mr. Rana that the employee had been instructed to screen his communications and was told that Mr. Rana was being "fired for cause." JPMorgan also blocked Mr. Rana's ability to access the Zoom platform on its internal systems. Two additional JPMorgan employees have separately corroborated the firm's internal characterization of Mr. Rana and its external communications with market participants concerning him. Certain of these witnesses have executed sworn affidavits in Mr. Rana's possession. Their identities are preserved pending discovery and the entry of an appropriate protective order.

225. The internal characterization of Mr. Rana as "fired for cause," "untrustworthy," and a "liar" was materially false. Its dissemination inside JPMorgan spilled into the broader financial services market, where Defendants amplified it through the conduct described above.

226. JPMorgan was on documented written notice no later than July 2, 2025, when Mr. Rana submitted a formal written data and preservation request, transmitted with an express litigation-hold demand by his then-counsel, identifying by name ten internal custodians, including

Hajdini, Graffeo, and Wolter, and encompassing JPMorgan's external communications concerning Mr. Rana with market participants. JPMorgan's continued communications with market participants about Mr. Rana after that demand were made with full awareness of it, and are independent evidence of Defendants' intent and malice.

227. Each of the relationships described above was a longstanding, multi-year relationship that Mr. Rana personally cultivated and, in many cases, personally introduced to JPMorgan. The cumulative effect of Defendants' interference permeates his entire professional network, has materially impaired his ability to source, originate, and execute transactions in his industry, and will continue to impair his career indefinitely. The relationships at issue, and the credibility built within them, were the product of years of work. Their destruction is permanent.

**JPMorgan Continues Its Retaliation by Destroying Plaintiff's Employment at Bregal Sagemount.**

228. On March 31, 2026, Mr. Rana signed an EEOC Charge of Discrimination. On or about April 1, 2026, it was filed with the EEOC, and JPMorgan received formal notice.

229. On April 2, 2026, one business day after JPMorgan received formal notice of the charge, and immediately after Mr. Rana's first investment opportunity cleared Bregal Sagemount's investment committee, Bregal Sagemount terminated his employment.

230. The termination meeting was deliberately cryptic. Bregal Sagemount refused to provide any reason for the decision, stating only that "something ha[d] come to [its] attention." The "something" was Mr. Rana's EEOC charge, which JPMorgan had just placed in Bregal Sagemount's hands. JPMorgan's disparagement and interference caused Mr. Rana's termination. That was precisely the result Defendants intended.

231. Based on the foregoing chronology, JPMorgan promptly informed Bregal Sagemount of Mr. Rana's EEOC charge and brought its commercial influence to bear against his

new employer. The content and timing of JPMorgan's communications with Bregal Sagemount concerning Mr. Rana are facts peculiarly within the knowledge of Defendants and Bregal Sagemount and will be established through discovery.

232. At the time of his termination, Mr. Rana was in good standing at Bregal Sagemount. He had received no warning, no criticism, and no indication that his position was in jeopardy; on the contrary, his first investment opportunity had just been approved by the firm's investment committee, and he ranked first on the credit team in originations. The termination completely blindsided him.

**JPMorgan Expands Its Retaliatory Campaign to Blackball Plaintiff Throughout the Private Credit Industry.**

233. The interference continued after the termination. On or about April 13, 2026, less than two weeks after Bregal Sagemount terminated his employment, Mr. Rana met with Matthew Haberlach ("Haberlach"), an Associate in Evercore's Technology, Media & Telecommunications group, at a meeting Mr. Rana understood to concern prospective professional opportunities in the industry. Haberlach had been made aware of Mr. Rana's lawsuit in advance of the meeting and had been asked by JPMorgan personnel to surreptitiously record the meeting and to disparage Mr. Rana's ethnic and religious background in order to provoke and evaluate his reaction. During the meeting, Haberlach directed derisive comments at Mr. Rana concerning his ethnic and religious background. Haberlach recorded the meeting without Mr. Rana's knowledge or consent and thereafter transmitted the recording to JPMorgan personnel and to other third parties in the industry so that they could assess Mr. Rana's intentions and anticipated next steps concerning his legal claims and his future career opportunities. This conduct was undertaken, upon information and belief, at JPMorgan's direction, with malice, and for the purpose of impeding Mr. Rana's ability to secure future employment and business opportunities in the industry.

234. The response was planned, and word of the planning reached Mr. Rana in real time. On or about May 1, 2026, within days of the commencement of the state-court action described above, an industry contact relayed to Mr. Rana, in a preserved text-message exchange, that a then-current JPMorgan employee had reported that JPMorgan was "planning to go big" in response to Mr. Rana's claims. The identities of the contact and the employee are known to Mr. Rana and are preserved for disclosure in discovery.

235. JPMorgan thereafter retaliated against that employee for the disclosure. The circumstances of JPMorgan's treatment of the employee are peculiarly within JPMorgan's knowledge and will be established through discovery. JPMorgan's willingness to punish its own personnel for warning Mr. Rana further evidences the deliberate and coordinated character of its campaign.

236. The pattern of Defendants' malicious conduct has been unmistakable. Every time Mr. Rana advanced his career or exercised his legal rights, Defendants moved to take that opportunity away. The Brookfield position disappeared after JPMorgan intervened. Mr. Rana's position at Bregal Sagemount, where he had again become the top producer on his team, ended one business day after JPMorgan received notice of his EEOC charge. Through malicious and deliberate lies spread across the tightly connected private credit and leveraged finance community, Defendants sought not merely to retaliate against Mr. Rana, but to erase him from the industry in which he had spent more than a decade building his reputation. None of this was accidental. It was the considered conduct of the largest bank in the United States, ratified at the level of its Managing Directors and carried out through its institutional machinery. It is precisely the conduct that punitive damages exist to deter, in a measure commensurate with the wealth and power of the institution that inflicted it.

**Defendants Acted Willfully, with Malice, and with Reckless Indifference to Mr. Rana's Rights.**

237. The conduct alleged throughout this Complaint was not the work of rogue junior employees. It was committed, directed, and condoned by JPMorgan's own management: Graffeo, the Managing Director who led the group; Wolter, a Managing Director; and Hajdini, an Executive Director and Mr. Rana's direct supervisor. Each acted within the scope of his or her employment and in the exercise of the supervisory authority JPMorgan conferred. Their conduct is JPMorgan's conduct.

238. JPMorgan ratified that conduct at the institutional level. It received Mr. Rana's detailed May 20, 2025 complaint and his June 5, 2025 complaint, and it responded by investigating nothing, disciplining no one, suspending the complainant, cutting his pay, and driving him from the Firm. Defendants acted with malice and with reckless indifference to Mr. Rana's protected rights, and JPMorgan made no good-faith effort to prevent, investigate, or correct the discrimination and retaliation of which it had actual notice.

**Mr. Rana Has Diligently Attempted to Rebuild His Career, But Defendants' Defamatory Campaign Has Made That Impossible.**

239. Mr. Rana has diligently mitigated his damages at every turn. Within days of his constructive discharge, he secured comparable employment at Bregal Sagemount, where he quickly became the top producer on the credit team. Defendants destroyed that position as well, as detailed above. Since then, Mr. Rana has relentlessly pursued employment and business opportunities throughout the private credit and leveraged finance industry. Each time he has attempted to rebuild his career, Defendants have intervened to ensure that opportunity was taken away.

240. Despite Mr. Rana's extraordinary efforts, Defendants' malicious and calculated campaign has accomplished exactly what it was intended to accomplish. Through lies, disparagement, and the deliberate dissemination of false and defamatory statements throughout the tightly connected private credit and leveraged finance community, and by ensuring those falsehoods reached members of the financial press and media, Defendants have made Mr. Rana effectively unemployable in the industry to which he devoted more than a decade of his life. Their objective was not merely to retaliate against him for reporting race discrimination, sexual assault, and serious compliance violations. It was to permanently destroy his career.

241. Defendants understood that reputation is everything in the private credit industry. They exploited their unparalleled market power, influence, and credibility to poison Mr. Rana's reputation before every prospective employer, investor, and industry participant. As a direct and foreseeable result, Defendants have made it virtually impossible for Mr. Rana to secure comparable employment despite his relentless efforts to do so. His remarkable career has been permanently and irreparably destroyed, not by chance, but by Defendants' deliberate and malicious campaign to erase him from the industry.

## CAUSES OF ACTION

### COUNT I
### Race and Ancestry Discrimination — 42 U.S.C. § 1981
### (Against All Defendants)

242. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

243. Section 1981 guarantees all persons the same right to make and enforce contracts free from racial and ancestry-based discrimination. Mr. Rana, a first-generation Nepali American, is protected on the basis of his race and ancestry.

244. Defendants intentionally discriminated against Mr. Rana through a hostile work environment of racial epithets and demeaning treatment, disparate treatment in support, recognition, deal credit, ratings, and flexibility, his reduction to a "point system" token, and his constructive discharge. Defendants and their agents repeatedly degraded Mr. Rana with overtly racial slurs, calling him a "monkey," a "brown boy," a "Brownie," and a "boy." Graffeo admitted the discriminatory motive in his own words, telling Hajdini, who relayed his statements to Mr. Rana on multiple occasions, that the only reason he hired Mr. Rana was that he needed a "Brown guy" on the team and that his hiring was part of the "point system" internally at JPMorgan. The conduct was severe or pervasive. Hajdini, Graffeo, Wolter, and Crowe personally participated; JPMorgan is liable for its supervisors' conduct and its own acts. But for Mr. Rana's race and ancestry, he would not have suffered this treatment.

245. Mr. Rana is entitled to compensatory and punitive damages and to attorneys' fees and costs under 42 U.S.C. § 1988.

**<u>COUNT II</u>**
**Retaliation — 42 U.S.C. § 1981**
**(Against JPMorgan, Hajdini, Graffeo, and Wolter)**

246. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

247. Section 1981 prohibits retaliation for opposing racial discrimination. Mr. Rana engaged in protected activity through his May 20, 2025 complaint. Defendants took materially adverse actions against him because of it, including his removal, the cutoff of his access, his involuntary leave while his harassers remained in place, the pay reduction, the toleration of racist "snitch" threats, his constructive discharge, and the post-employment campaign of disparagement and interference that culminated in the destruction of his employment at Bregal Sagemount one business day after JPMorgan received notice of his EEOC charge, with JPMorgan's own Employee

Relations Partner conceding that Mr. Rana had done nothing wrong and refusing to deny that the leave was retaliatory. But for his protected activity, Defendants would not have acted.

248. Mr. Rana is entitled to compensatory and punitive damages and to fees and costs under § 1988.

**COUNT III**
**FMLA Interference — 29 U.S.C. § 2615(a)(1)**
**(Against JPMorgan)**

249. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

250. Mr. Rana was an eligible employee and JPMorgan a covered employer under the FMLA, as confirmed by JPMorgan's own approval of twelve weeks of FMLA leave to care for his mother under 29 U.S.C. § 2612(a)(1)(C).

251. The FMLA makes it unlawful to interfere with, restrain, or deny the exercise of any right under the Act. 29 U.S.C. § 2615(a)(1). JPMorgan interfered by failing, after Mr. Rana's formally approved March–May 2025 leave, to restore him to the same or an equivalent position as required by 29 U.S.C. § 2614(a); by stopping his proper pay and cutting off his access after his return in contravention of its own approval; by twice reclassifying his protected leave as "unpaid" without notice; by using his FMLA leave as a negative factor against him; and by discouraging and chilling his exercise of FMLA rights in November 2024, when it ordered him back to New York and away from the seriously injured mother he was entitled to take leave to care for.

252. As a direct and proximate result, Mr. Rana was prejudiced and suffered lost wages, benefits, and other damages. JPMorgan's violations were willful, entitling Mr. Rana to liquidated damages and the three-year limitations period under 29 U.S.C. § 2617.

**COUNT IV**
**FMLA Retaliation — 29 U.S.C. § 2615(a)**
**(Against JPMorgan)**

253. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

254. Mr. Rana engaged in FMLA-protected activity by taking JPMorgan-approved leave to care for his seriously injured mother. The FMLA prohibits discrimination against an employee for exercising those rights. 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220(c).

255. JPMorgan subjected Mr. Rana to materially adverse actions (withdrawal of support, removal from his role, termination of systems access, involuntary leave, the pay reduction, and constructive discharge) because he exercised his FMLA rights. Causation is established by the close temporal proximity to his May 27, 2025 return. Pretext is established by JPMorgan's own words: it admitted in writing that the June 30 pay cut was an error, promised that the missing wages would be wired that day, and never paid them.

256. As a direct and proximate result, Mr. Rana suffered damages. JPMorgan's conduct was willful, entitling Mr. Rana to liquidated damages and the three-year limitations period under 29 U.S.C. § 2617.

**COUNT V**
**Discrimination and Hostile Work Environment (Race and National Origin) — Title VII, 42 U.S.C. § 2000e *et seq.***
**(Against JPMorgan)**

257. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

258. Title VII prohibits an employer from discriminating against an employee in the terms, conditions, or privileges of employment because of race, national origin, or religion, including by subjecting the employee to a hostile work environment. Through the conduct alleged herein, including the racial epithets, the mockery of Mr. Rana's national origin, the "point system" tokenization, the disparate treatment in support, evaluations, deal credit, and flexibility, the

targeting of Mr. Rana as the team's only non-white, non-Christian banker, and his constructive discharge, JPMorgan discriminated against Mr. Rana and subjected him to a severe or pervasive hostile work environment because of his race, national origin, and religion. The conduct comprising that hostile work environment constituted a single, continuing unlawful employment practice; acts contributing to that hostile work environment occurred within 300 days of Mr. Rana's EEOC charge, rendering the entire course of conduct timely and actionable.

259. JPMorgan is liable for the conduct of Mr. Rana's supervisors and for its own acts and omissions, including its failure to investigate or remediate the discrimination of which it had actual notice. Mr. Rana timely filed Charge No. 520-2026-04653 and commences this action within 90 days of receiving his notice of rights. He is entitled to back pay, front pay, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 2000e-5(g), (k) and 1981a.

**COUNT VI**
**Sex Discrimination and Sexual Harassment — Title VII, 42 U.S.C. § 2000e *et seq.***
**(Against JPMorgan)**

260. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

261. Title VII prohibits discrimination because of sex, including *quid pro quo* sexual harassment and a sexually hostile work environment. Through Hajdini's conduct alleged herein, including conditioning Mr. Rana's advancement on submission to her sexual demands, threatening to destroy his career if he refused, and subjecting him to unwanted sexual contact and coerced sexual acts, Mr. Rana was discriminated against because of his sex. Hajdini was Mr. Rana's supervisor within the meaning of Title VII, and her harassment culminated in tangible employment actions, including the conditioning of his anticipated Executive Director promotion on submission to her sexual demands, the manipulation of his evaluations and compensation, and his constructive discharge. JPMorgan is liable for her conduct and for its own failure to prevent or remediate it

despite notice. The conduct comprising that sexually hostile work environment constituted a single, continuing unlawful employment practice, and acts contributing to it, culminating in Mr. Rana's constructive discharge, occurred within 300 days of Mr. Rana's EEOC charge, rendering the entire course of conduct timely and actionable.

262. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 2000e-5(g), (k) and 1981a.

**COUNT VII**
**Retaliation — Title VII, 42 U.S.C. § 2000e-3(a)**
**(Against JPMorgan)**

263. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

264. Title VII prohibits retaliation against an employee for opposing discriminatory practices or for filing a charge with the EEOC. Mr. Rana engaged in protected activity through his May 20, 2025 complaint, his June 5, 2025 complaint, and his April 1, 2026 EEOC Charge. JPMorgan retaliated through the adverse actions alleged herein, including his removal, the pay reduction, his indefinite involuntary leave, his constructive discharge, and the post-employment campaign of disparagement and interference, culminating in the termination of his employment at Bregal Sagemount one business day after JPMorgan received formal notice of his EEOC Charge.

265. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages, and attorneys' fees and costs under 42 U.S.C. §§ 2000e-5(g), (k) and 1981a.

**COUNT VIII**
**Gender Discrimination and Sexual Harassment — N.Y. Exec. Law § 296**
**(Against JPMorgan)**

266. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

267. Under the NYSHRL it is unlawful to treat an employee less well because of gender, including through sexual harassment. JPMorgan did so through Hajdini's sexual coercion and

abuse of Mr. Rana, which JPMorgan permitted and failed to remediate, creating a hostile work environment.

268. Defendant's unlawful actions constitute malicious, willful, and wanton violations of the NYSHRL. Mr. Rana is entitled to compensatory and punitive damages and to fees and costs under N.Y. Exec. Law § 297.

**COUNT IX**
**Retaliation — N.Y. Exec. Law § 296(7)**
**(Against JPMorgan)**

269. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

270. The NYSHRL prohibits retaliation for opposing discrimination. Mr. Rana engaged in protected activity through his May 20, 2025 complaint, and JPMorgan retaliated through the adverse actions and continuing post-employment interference alleged herein.

271. Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL. Mr. Rana is entitled to compensatory and punitive damages and to fees and costs under N.Y. Exec. Law § 297.

**COUNT X**
**Aiding and Abetting — N.Y. Exec. Law § 296(6)**
**(Against Hajdini, Graffeo, Wolter, and Crowe)**

272. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

273. The NYSHRL makes it unlawful for any person to aid, abet, incite, compel, or coerce the doing of any act forbidden under the statute. N.Y. Exec. Law § 296(6).

274. By the actions described herein, Hajdini, Graffeo, Wolter, and Crowe each personally participated in, encouraged, and carried out discriminatory and/or retaliatory conduct including but not limited to racial harassment, sexual coercion, the tokenization, and/or the retaliation against Mr. Rana for engaging in protected activity.

275. Each individual Defendant thereby aided and abetted JPMorgan's violations of the NYSHRL.

276. Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYSHRL. They are individually liable, and Mr. Rana is entitled to compensatory and punitive damages and to fees and costs under N.Y. Exec. Law § 297.

**COUNT XI**
**Race Discrimination — N.Y.C. Admin. Code § 8-107**
**(Against All Defendants)**

277. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

278. Under the NYCHRL it is unlawful to treat an employee less well, in whole or in part, because of race, color, or national origin. Defendants did so through the racial epithets, the "keep it white and Christian" and "keep the firm strong and white" conduct, the "point system" tokenization, the disparate treatment, and the constructive discharge alleged herein, creating a hostile work environment. Hajdini, Graffeo, Wolter, and Crowe are individually liable under § 8-107(1) and (6).

279. Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages and to fees and costs under § 8-502.

**COUNT XII**
**Gender Discrimination and Sexual Harassment — N.Y.C. Admin. Code § 8-107**
**(Against JPMorgan, Hajdini, Graffeo, and Wolter)**

280. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

281. Under the NYCHRL it is unlawful to treat an employee less well because of gender, including through sexual harassment. Hajdini did so by making unwanted sexual advances, touching Mr. Rana without consent, coercing him into non-consensual acts through threats of

professional retaliation, and drugging him, creating a hostile work environment that JPMorgan permitted and failed to remediate. Hajdini, Graffeo, and Wolter are individually liable under § 8-107(1) and (6).

282. Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages and to fees and costs under § 8-502.

**COUNT XIII**
**Retaliation — N.Y.C. Admin. Code § 8-107(7)**
**(Against All Defendants)**

283. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

284. The NYCHRL prohibits retaliation against any person for opposing discrimination. Mr. Rana engaged in protected activity through his May 20, 2025 complaint, and JPMorgan retaliated by diminishing his role, withholding pay, placing him on involuntary leave while his harassers remained, tolerating racist threats, constructively discharging him, and continuing to interfere with his career after his departure, conduct reasonably likely to deter protected activity.

285. Defendants' unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages and to fees and costs under § 8-502.

**COUNT XIV**
**Gender-Motivated Violence — N.Y.C. Admin. Code § 10-1101 *et seq.***
**(Against Hajdini and JPMorgan)**

286. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

287. The New York City Victims of Gender-Motivated Violence Protection Law affords a civil cause of action to any person injured by a crime of violence motivated by gender. N.Y.C. Admin. Code §§ 10-1101 to 10-1107. Hajdini committed such crimes against Mr. Rana, drugging

him without his knowledge or consent and subjecting him to non-consensual sexual acts, conduct that constituted crimes of violence, including rape in the third degree under N.Y. Penal Law § 130.25, criminal sexual act in the third degree under former N.Y. Penal Law § 130.40 with respect to conduct predating the September 1, 2024 amendments to Penal Law Article 130, and forcible touching under N.Y. Penal Law § 130.52, committed because of, and motivated by animus based on, Mr. Rana's gender. Hajdini's conduct, including drugging Mr. Rana without his knowledge or consent and forcing sexual contact over his express objection, presented a serious risk of physical injury to him within the meaning of N.Y.C. Admin. Code § 10-1103. The gender-based animus is evident from the conduct itself and from Hajdini's own words, including her repeated declarations that she "owned" Mr. Rana and her taunts that no one would ever believe a male subordinate. JPMorgan enabled and participated in the commission of that conduct within the meaning of N.Y.C. Admin. Code § 10-1104: it conferred and maintained the supervisory authority over Mr. Rana that Hajdini wielded to extract his submission, including her control over his assignments, his evaluations, and his promotion, and, after notice of her conduct, left her employed and untouched while removing only Mr. Rana.

288. As a direct and proximate result, Mr. Rana suffered severe physical and psychological injury. He is entitled to compensatory and punitive damages, injunctive and declaratory relief, and attorneys' fees and costs under N.Y.C. Admin. Code § 10-1104.

**COUNT XV**
**Caregiver Status Discrimination — N.Y.C. Admin. Code § 8-107**
**(Against JPMorgan)**

289. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

290. Mr. Rana was a "caregiver" within the meaning of the NYCHRL, N.Y.C. Admin. Code § 8-102, in that he provided direct and ongoing care for his mother, a covered relative who,

because of a serious health condition, relied on him for medical care and to meet the needs of daily living. JPMorgan knew Mr. Rana was a caregiver: its own leave administrator formally designated his leave for the purpose of caring for his mother.

291. Under the NYCHRL it is unlawful to treat an employee less well, in whole or in part, because of the employee's caregiver status. JPMorgan did so. It denied Mr. Rana the geographic flexibility it freely extended to non-caregiver colleagues, forced him to choose between caring for his mother and keeping his job, interfered with and curtailed the leave it had approved for that care, and then refused to restore him, slashed his pay, cut off his systems access, and placed him on indefinite involuntary leave. JPMorgan is liable through the acts of Graffeo and Wolter, who exercised managerial and supervisory authority over Mr. Rana, under § 8-107(13).

292. Defendants' unlawful actions constitute malicious, willful, and wanton violations of the NYCHRL. Mr. Rana is entitled to back pay, front pay, compensatory and punitive damages and to fees and costs under § 8-502.

**COUNT XVI**
**Tortious Interference With Prospective Economic Advantage**
**(Against JPMorgan, Hajdini, Graffeo, and Wolter)**

293. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

294. At all relevant times Mr. Rana maintained business and prospective business relationships with third-party market participants and employers in the financial-services industry, including but not limited to Bregal Sagemount and any and all subsidiaries and affiliates of Bregal Investments, other third-party institutions and market participants, and numerous private-equity sponsors that had a reasonable probability of generating economic benefit to him. JPMorgan and Hajdini knew of these relationships, in many instances because Mr. Rana had originated or introduced them. Mr. Rana further alleges that JPMorgan and any and all subsidiaries of JPMorgan

Chase & Co., including J.P. Morgan Asset Management, have foreclosed Mr. Rana from prospective opportunities within JPMorgan's own enterprise; because a party cannot tortiously interfere with its own prospective relations, that foreclosure is pleaded as retaliatory conduct actionable under Counts II, IX, and XIII, which are incorporated herein by reference.

295. JPMorgan, Graffeo, Wolter, and Hajdini intentionally interfered with these relationships through wrongful means, including defamation, disparagement, the communication of Mr. Rana's protected activity to third parties, and the use of JPMorgan's commercial leverage over market participants. Such interference included Hajdini's aggressively negative references to prospective employers in early 2025, falsely telling a prospective employer that Mr. Rana was unqualified, derailing his Brookfield opportunity, and causing the termination of Mr. Rana's employment at Bregal Sagemount one business day after JPMorgan received formal notice of his discrimination charge. It further included the conduct alleged above involving PE Fund #1 through PE Fund #14: forwarding internal investment committee correspondence concerning Mr. Rana to a transaction counterparty, instructing market participants to cease sending him deal flow, blocking proprietary transactions Mr. Rana had originated through his own executive relationships, working to block a $100 million preferred-equity transaction he had originated at his new employer's investment committee, threatening to cease doing business with any firm that maintained a business relationship involving him, and procuring his exclusion from three platform financings and from a newly formed fund's inaugural transaction. Hajdini had announced her intentions in advance, warning Mr. Rana to "***be careful in this industry—you never know who you will overlap with***" and telling him, "You think I'm going to let you go that easily?"

296. This interference was undertaken by wrongful means and for the purpose of harming Mr. Rana, not in furtherance of any legitimate business interest, and the resulting harm

was the intended consequence of, or was substantially certain to follow from, JPMorgan's and Hajdini's conduct. But for Defendants' wrongful interference, Mr. Rana would have obtained and retained the economic benefits of those relationships, including his continued employment at Bregal Sagemount, the Brookfield position, and the transactions and deal flow alleged above. The effect is visible in the record: although Mr. Rana ranked as the top producer on his team, the transactions he sourced stalled and failed to advance at a rate that defies chance absent external interference, consistent with the defamatory communications JPMorgan and its agents directed at the market.

297. As a direct and proximate result, Mr. Rana has suffered lost compensation, lost carried interest, lost business and employment opportunities, and permanent reputational and career harm, in amounts to be determined at trial. JPMorgan's and Hajdini's conduct was willful and malicious, justifying punitive damages.

298. The breadth of Defendants' interference campaign is corroborated across the market. Partners, Managing Directors, Principals, and Vice Presidents at no fewer than forty-six (46) financial institutions and market participants, including investment banks, private equity sponsors, private credit funds, and advisory firms, have witnessed and corroborated the retaliation and ongoing tortious interference alleged herein. The identities of those institutions, and of the 112 identified individuals employed at or affiliated with them, are known to Mr. Rana and are preserved for disclosure in discovery. Plaintiff's allegations are anchored in a pre-suit investigation encompassing witness interviews and the review of preserved electronic communications, text messages, and related data, and will be further developed through formal discovery.

**<u>COUNT XVII</u>**
**Defamation and Defamation *Per Se***
**(Against JPMorgan, Graffeo, and Wolter)**

299. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

300. Beginning after Mr. Rana's departure from JPMorgan in October 2025 and continuing thereafter, JPMorgan, through Graffeo and Wolter and other agents acting within the scope of their employment and in furtherance of the Firm's interests, made and caused to be made false statements of fact about Mr. Rana to participants in the private credit and leveraged finance markets, including financial institutions, prospective employers, and business counterparties with whom Mr. Rana was seeking to do business. Among other things, Defendants stated that Mr. Rana had been "fired" and "fired for cause" by JPMorgan; that he was "suing" the Firm and "suing for sexual harassment" and in "active litigation" against the Firm; that he was a "liar," "litigious," and "untrustworthy," and that others "cannot trust" him; that he was "a moron" and "an idiot" who "does not understand credit"; that he had a "poor reputation"; that he had never been a "real" investment banking analyst, had misrepresented his experience, had never closed a sell-side or buy-side transaction, lacked "live deal experience," and had no relationships capable of generating deal flow; that he was "lazy," "incompetent," and an "introvert"; and that he drank to excess several times per week. Each statement of fact was false when made. Mr. Rana was not fired but was placed on involuntary administrative leave and constructively discharged; when Defendants began telling the market that he was "suing" the Firm, including on or about December 12, 2025, he had filed no lawsuit and no charge, and he did not file a charge of discrimination until April 1, 2026, or commence suit until April 27, 2026; his leave was Firm-approved and taken to care for his seriously injured mother; and he did not misrepresent his experience or qualifications, engage in the personal misconduct attributed to him, or lack competence or integrity in his profession. The statements charged Mr. Rana with dishonesty and with incompetence in the very trade by which

he earns his living, and were calculated to turn the private credit and leveraged finance markets against him.

301. These statements were false, were published to third parties, and were defamatory *per se* in that they tended to injure Mr. Rana in his trade, business, and profession. JPMorgan, Graffeo, and Wolter made them with knowledge of their falsity or with reckless disregard for their truth, and with malice arising from Mr. Rana's protected activity. Because Graffeo and Wolter made the statements within the scope of their employment and in furtherance of JPMorgan's interests, JPMorgan is vicariously liable for them, and Graffeo and Wolter are independently liable for their own statements. No privilege protected the statements, or any privilege was forfeited by malice and abuse.

302. As a direct and proximate result, Mr. Rana has suffered injury to his reputation, lost compensation and opportunities, and emotional distress; damages are presumed for defamation *per se*. The conduct of JPMorgan, Graffeo, and Wolter was willful and malicious, justifying punitive damages.

**COUNT XVIII**
**Sexual Assault and Battery**
**(Against Hajdini)**

303. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

304. Hajdini intentionally subjected Mr. Rana to harmful and offensive sexual contact without his consent. As alleged above, she groped him at team events and in public settings, forcibly kissed and touched him, coerced him into non-consensual sexual intercourse, oral sex, and other sexual acts through threats of professional retaliation, and drugged him to facilitate that contact. Her conduct placed Mr. Rana in imminent apprehension of offensive contact and effected that contact without his consent and over his express objection.

305. As a direct and proximate result, Mr. Rana suffered severe physical and psychological injury, economic loss, humiliation, loss of dignity, and past and future severe emotional distress.

306. Hajdini's conduct was willful, wanton, and malicious, and was undertaken with conscious disregard of Mr. Rana's rights, entitling him to punitive and exemplary damages.

307. Mr. Rana's claims for sexual assault and battery are timely pursuant to CPLR § 213-c.

**COUNT XIX**
**Failure to Pay Wages and Unlawful Deductions — N.Y. Labor Law § 193**
**(Against JPMorgan)**

308. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

309. New York Labor Law § 193 prohibits an employer from making unauthorized deductions from an employee's wages, and provides that there is no exception to liability for the unauthorized failure to pay wages, benefits, or wage supplements. N.Y. Lab. Law § 193(1), (5).

310. Through the sustained pattern alleged above, beginning in or about April 2025 and continuing thereafter, including the manipulation of Mr. Rana's payroll records, recurring retroactive "Leave of Absence" offsets applied without documentation or authorization, the reduction of his pay without notice, and the unauthorized reclassification of his paid leave, JPMorgan failed to pay Mr. Rana wages he had earned and made unlawful deductions from his compensation within the meaning of § 193, withholding approximately $18,000 owed to him.

311. JPMorgan's violations were willful within the meaning of N.Y. Labor Law § 198. JPMorgan was on actual notice of the deductions and withholdings through Mr. Rana's repeated formal escalations beginning in or about April 2025, admitted the June 30, 2025 payroll error in

writing, possessed every record necessary to identify and remediate the violations, and nonetheless allowed them to continue across multiple pay periods.

312. As a direct and proximate result, Mr. Rana suffered lost wages and is entitled to recover the unpaid amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs under N.Y. Labor Law § 198.

**COUNT XX**
**Retaliation — N.Y. Labor Law § 215**
**(Against JPMorgan)**

313. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

314. The New York Labor Law prohibits an employer from retaliating against an employee because he has complained that the employer violated the Labor Law. N.Y. Lab. Law § 215. After Mr. Rana complained internally about the manipulation of his pay and the unauthorized withholding of his wages, JPMorgan, through Wolter and others, retaliated against him, including by sending a threatening email and by continuing to withhold the wages owed to him. Mr. Rana is entitled to lost compensation, liquidated damages of up to $20,000, and attorneys' fees and costs under N.Y. Lab. Law § 215.

**COUNT XXI**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

315. Mr. Rana repeats and realleges each foregoing paragraph as if fully set forth herein.

316. Defendants engaged in extreme and outrageous conduct that went beyond all possible bounds of decency, in a continuous and ongoing course of conduct extending to within one year of the commencement of this action: Hajdini's sexual coercion, drugging, and abuse, fused with racial degradation; the racial epithets and tokenization; the campaign of anonymous threats invoking Mr. Rana's race and his family's immigration status, culminating in the

September 9, 2025 threats to his family; and the sustained campaign to destroy his livelihood, continuing through the destruction of his Bregal Sagemount employment on April 2, 2026. Defendants acted intentionally or with reckless disregard of the substantial probability of causing Mr. Rana severe emotional distress.

317. This conduct in fact caused Mr. Rana severe emotional distress, including post-traumatic stress disorder for which he has required treatment. Mr. Rana is entitled to compensatory and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

(a) A declaration that Defendants' conduct violated Title VII, the FMLA, 42 U.S.C. § 1981, the NYSHRL, the NYCHRL, the New York Labor Law, the Victims of Gender-Motivated Violence Protection Law, and New York common law;

(b) Back pay, front pay, and lost benefits and other compensation;

(c) Liquidated damages under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii);

(d) Compensatory damages under § 1981, the NYSHRL, the NYCHRL, and the common law for emotional distress and reputational and career harm;

(e) Compensatory and presumed damages for tortious interference, defamation, sexual assault and battery, and intentional infliction of emotional distress, in amounts to be determined at trial;

(f) Unpaid wages, liquidated damages, and prejudgment interest under N.Y. Labor Law §§ 193, 198, and 215;

(g) Punitive damages under § 1981, the NYSHRL, the NYCHRL, the Victims of Gender-Motivated Violence Protection Law, and the common law;

(h) Equitable relief, including reinstatement or, in lieu thereof, front pay, and injunctive relief under N.Y.C. Admin. Code § 10-1104;

(i) Prejudgment and post-judgment interest;

(j) Reasonable attorneys' fees, expert fees, and costs under 29 U.S.C. § 2617, 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), N.Y.C. Admin. Code §§ 8-502 and 10-1104, N.Y. Exec. Law § 297, and N.Y. Labor Law §§ 198 and 215; and

(k) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
October 12, 2026

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

By: ______________________________
Jon L. Norinsberg, Esq.
Bennitta L. Joseph, Esq.
John J. Meehan, Esq.
Monica Hincken, Esq.
Kassandra Vazquez, Esq.

jon@norinsberglaw.com
*(212) 227-5700*

*Attorneys for Plaintiff Chirayu S. Rana*