UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

CHIRAYU S. RANA,

Plaintiff,

-against-

JPMORGAN CHASE BANK, N.A., LORNA HAJDINI, BRANDON GRAFFEO, JON WOLTER, and KELLY CROWE,

Defendants.

------------------------------------------------------- X

Case No. 26-cv-06351-LAK

**DEFENDANT/COUNTERCLAIM PLAINTIFF LORNA HAJDINI'S**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

II. RELEVANT FACTUAL BACKGROUND ......................................................................... 3

A. The origins of Plaintiff's scheme to extract money from current and former employers... 3

B. Plaintiff supplied his witnesses' supposed "sworn" observations. .................................... 5

C. Chandani has now confirmed under oath that her purported observations were false. ...... 8

D. J&N repeatedly vouched for—and trumpeted—the perjured affirmations in court and in the media. ........................................................................................................ 9

III. ARGUMENT ........................................................................................................ 12

A. Plaintiff's use of perjured and falsified evidence requires dismissal with prejudice........ 13

B. Plaintiff and J&N must pay the fees and costs their bad faith caused. ............................ 14

C. The sanctions order should correct the record and be disclosed to the press outlets Plaintiff and J&N leveraged. ........................................................................................ 16

D. The Court should retain jurisdiction over Ms. Hajdini's counterclaims. .......................... 18

IV. CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Science & Engineering, Inc. v. Autoclear, LLC,*
606 F. Supp. 2d 617 (E.D. Va. 2008) ....18

*Banus v. Citigroup Global Markets, Inc.,*
757 F. Supp. 2d 394 (S.D.N.Y. 2010)....3, 12, 15

*Catzin v. Thank You & Good Luck Corp.*,
899 F.3d 77 (2d Cir. 2018)....18

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)....12, 14

*Enmon v. Prospect Cap. Corp.*,
675 F.3d 138 (2d Cir. 2012)....12, 14

*Galin v. Hamada*,
283 F. Supp. 3d 189 (S.D.N.Y. 2017), *aff'd*, 753 F. App'x 3 (2d Cir. 2018)....15

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017)....16

*In re John Doe, Inc.*,
13 F.3d 633 (2d Cir. 1994)....4

*In re Richard Roe, Inc.*,
168 F.3d 69 (2d Cir. 1999)....4

*Lawrence v. City of New York*,
2018 WL 3611963 (S.D.N.Y. July 27, 2018) ....14

*Liebowitz v. Bandshell Artist Management*,
6 F.4th 267 (2d Cir. 2021) ....16, 18

*Mata v. Avianca, Inc.*,
678 F. Supp. 3d 443 (S.D.N.Y. 2023)....16, 18

*Mitchell v. Lyons Prof'l Servs., Inc.*,
708 F.3d 463 (2d Cir. 2013)....17

*In re Reyes*,
651 B.R. 99 (Bankr. S.D.N.Y. 2023) ....15

*Rossbach v. Montefiore Medical Center*,
81 F.4th 124 (2d Cir. 2023) ........................................................................................ *passim*

*Wilson v. Citigroup, N.A.*,
702 F.3d 720 (2d Cir. 2012).........................................................................................16

**Statutes**

28 U.S.C. § 1367(c)(3)...................................................................................................18

28 U.S.C. § 1927..........................................................................................................12, 14

**Other Authorities**

Fed. R. Civ. P. 43(c) .......................................................................................................14

N.Y. R. Prof. Conduct 1.16(a) .........................................................................................11

N.Y. R. Prof. Conduct 3.3...........................................................................................15, 16

# I. INTRODUCTION[1]

Imagine a person—a human being, with a family, a livelihood, and a life she has worked hard to build—who has tried to do things right. She shows up for work, puts in the hours, cares for her family, and spends more than fifteen years building a successful career at one of the nation's leading financial institutions, earning her colleagues' respect and friendship along the way. Then one day, without warning, a colleague accuses her of drugging and repeatedly raping him. The accusations are graphic and horrifying. The accuser claims to have eyewitnesses who can corroborate his account. To anyone looking in, the accusations appear to carry the weight of experienced counsel and independent evidence. There is just one problem: ***None of it is true.***

That is this case. Defendant/Counterclaim Plaintiff Lorna Hajdini ("Ms. Hajdini") is that person. After Ms. Hajdini had spent fifteen years at JPMorgan Chase Bank, N.A. ("JPMC"), Plaintiff Chirayu Rana ("Plaintiff") sought to turn her livelihood and reputation into leverage for an extortionate financial payout. He accused her of drugging and raping him. He supplied graphic details calculated to humiliate her. And he even enlisted his own sister, Chandani Rana, and longtime friend, Allan Flott, to provide sworn corroboration. He carried those accusations from an internal complaint to JPMC to a state court lawsuit, an international media campaign, and ultimately this Court. Ms. Hajdini has consistently denied any romantic or sexual contact with Plaintiff, and has never even entered the apartment where he claims the assaults occurred. ECF No. 82 at 1. The entire story was a calculated fraud.

But now, the supposed proof has collapsed. Plaintiff's own sister has recanted her eyewitness account. In her words: "***I did not see them. I was not present for any of the events it describes.***" Declaration of Chandani Rana (October 22, 2026) ("Chandani Recantation") ¶ 3

[1] Ms. Hajdini joins and endorses all factual statements and legal arguments set forth in JPMC's October 26, 2026 memorandum in support of its motion for sanctions. *See* ECF Nos. 84-87.

(Rodridguez Decl. Ex. H). Plaintiff told her what to say, wrote it down, and passed her notes and whispered instructions during her interview with his attorney. *Id.* ¶ 7. He knew she had witnessed none of it. *Id.* ¶ 13. There was never independent corroboration. As Ms. Hajdini has maintained from the outset, it was all a fraud. And worse, Joseph & Norinsberg LLC ("J&N") had ample warning. Plaintiff's sister confirms that her counsel contacted Plaintiff's attorneys in July 2026 to urge discontinuance of the litigation. Chandani Recantation ¶ 13. Yet J&N continued to tout its "sworn witness accounts" and "extensive pre-suit investigation," repeating the fabricated allegations in court and promoting them in the media. By October, there was no room for doubt: before J&N moved to withdraw, Chandani's counsel expressly told Jon Norinsberg at J&N that she was recanting. Declaration of Melissa C. Rodriguez (October 22, 2026) ("Rodriguez Oct. 22 Decl.") (ECF No. 73-1) ¶ 34. J&N sought withdrawal anyway. ECF No. 55. And despite knowing that the supposed corroboration was a fraud, they did nothing to correct the fraud on the court.

Despite their falsity, Plaintiff's accusations have inflicted lasting harm on Ms. Hajdini. Her name is now forever linked to allegations of rape, drugging, and sexual predation. Strangers have used her name and pictures to create and circulate sexualized memes, fabricated social-media posts, and even AI-generated pornography. Her family and friends have watched helplessly as these false accusations spread, while Ms. Hajdini has suffered severe emotional distress requiring ongoing treatment. ECF No. 82, Counterclaims ¶¶ 102–10, 159–63; *infra* § II.D. The affirmations can be withdrawn and the case dismissed, but neither will undo the public nightmare Ms. Hajdini has endured—and will continue to endure.

That enduring harm makes the relief sought here by Ms. Hajdini and JPMC all the more important. Plaintiff did not merely make false accusations. He enlisted his friends and family to substantiate them, carried their supposed observations into court and, with counsel's assistance,

portrayed Ms. Hajdini to the world as a sexual predator. In *Rossbach v. Montefiore Medical Center*, the Second Circuit affirmed dismissal of claims that were supported by fabricated evidence. 81 F.4th 124, 138–42 (2d Cir. 2023). And in *Banus v. Citigroup Global Markets, Inc.*, this Court required counsel to pay the defendant's attorneys' fees for pursuing litigation in bad faith. 757 F. Supp. 2d 394, 399–403 (S.D.N.Y. 2010) (Kaplan, J.). Both principles apply here.

Ms. Hajdini therefore joins JPMC's motion for sanctions (ECF No. 85 ("JPMC Br.")) in seeking dismissal of Plaintiff's claims with prejudice, as well as preservation of her counterclaims in this Court, and the fees and costs caused by Plaintiff's fraud and J&N's bad faith conduct. Ms. Hajdini further requests that the Court require Plaintiff and J&N to send corrective notices to the press outlets they themselves used to publicize the accusations, giving the Court's findings a chance to reach the same audience.

No order can fully restore Ms. Hajdini's reputation or undo what she has suffered. But the Court can put an end to this fraudulent litigation, hold those responsible accountable, and put an end to Ms. Hajdini's ongoing nightmare.

## II. RELEVANT FACTUAL BACKGROUND

### A. The origins of Plaintiff's scheme to extract money from current and former employers.

Plaintiff first honed his scheme while employed at Morgan Stanley. In 2023, he falsely accused a ***male*** supervisor of sexual harassment and sought to recruit a coworker as a corroborating witness, telling the coworker that "if you're part of the lawsuit you could make a lot of money." Declaration of Melissa C. Rodriguez (October 26, 2026) ("Rodriguez Decl.") Ex. A at LH-MS-000266, -000302. A coworker also reported that Plaintiff planned to say he was bisexual "to make his sexual harassment claim stronger." *Id.* at LH-MS-000303. And when questioned about falsifying information and the harm to the accused and his family, Plaintiff responded: "why would

I care I care about my livelihood." *Id.* Ultimately, after Morgan Stanley found Plaintiff's allegations "Not Supported," he departed with a separation agreement. Rodriguez Decl. Ex. A at LH-MS-000278–81; *id.* Ex. B at LH-MS-000429 (Plaintiff was "terminated with a separation agreement due to management's concerns regarding [Plaintiff's] inappropriate behavior").

Unsatisfied with that outcome, Plaintiff subsequently tried to escalate his allegations against Morgan Stanley, posting on a website—under his own name—alleging that his male "former boss" at Morgan Stanley had raped and sexually assaulted him, forced him to use drugs, and retaliated against him for seeking an internal transfer. Rodriguez Decl. Ex. C at LH-JUSTANSWER-000000001. In an associated telephone exchange, he described living in California (where he worked for Morgan Stanley, not JPMC), placed the events in 2023, and said the former boss became "incredibly hostile" after learning he was "actually gay."[2] *Id.* at LH-JUSTANSWER-000000008-09.

Plaintiff has since tried to distance himself from the website account. When confronted with screenshots of the website during an interview with *The Juggernaut*, he claimed he had "no idea what that is" and called the screenshots "Deepfakes." Rodriguez Decl. Ex. F at 5. But in his answer to Ms. Hajdini's state counterclaims, Plaintiff acknowledged visiting the website and claimed he had "camouflaged his experience with Hajdini while employed at JPMC." NYSCEF

[2] The audio recording of Plaintiff's telephone call with a JustAnswers representative was produced in native format as LH-JUSTANSWER-000000004.MP3 (Rodriguez Decl. ¶ 4). *See* Rodriguez Decl. Ex. C (Native Audio File). None of these communications are privileged. The website expressly describes itself as a "public forum," warns that communications are "not private or confidential or protected by the attorney-client privilege," and states that the expert "is not your attorney." Rodriguez Decl. Ex. G at 6–7. JustAnswer's then-effective Terms of Service likewise disclaim confidentiality and privilege, expressly including "phone calls and other virtual communications." *See* JustAnswer, Terms of Service §§ 2, 7 (Sept. 22, 2024). Moreover, Plaintiff's communications were also made in furtherance of a crime—and therefore, in all events, would be discoverable under the crime-fraud exception to any potentially applicable privilege. *In re John Doe, Inc.*, 13 F.3d 633, 635, 637–38 (2d Cir. 1994); In re Richard Roe, Inc., 168 F.3d 69, 71–72 (2d Cir. 1999).

No. 134 at 3. That explanation does not account for his own detailed description of a male supervisor in California, events in 2023, an internal-transfer attempt, a separation agreement, and a request for reinstatement—facts relevant only to Morgan Stanley, not JPMC or Ms. Hajdini.

Plaintiff's personal narrative has shifted too. In state court, Plaintiff presented himself as having a wife—describing an insult to "Plaintiff's wife," attributing graphic and racial comparisons about that "wife" to Ms. Hajdini, and alleged that his wife received threatening messages. NYSCEF No. 111 ¶ 41 (alleging that Ms. Hajdini referred to Plaintiff's purported wife as his "little Asian, fish head, wife"); *see also id.* ¶¶ 31, 41, 46, 95. By July, his "wife" had become a girlfriend with whom he claimed to be in a "committed, monogamous, live-in relationship." ECF No. 1 ¶ 72. And most recently, the October 12 amended complaint deletes these allegations altogether, removing the commitment, monogamy, cohabitation, and contemplated marriage entirely. *Compare* ECF No. 1 ¶ 72, *with* ECF No. 53 ¶ 72. It also omitted the claim that Ms. Hajdini helped destroy his nearly two-year relationship and removed the allegation that JPMorgan falsely accused him of infidelity. *Compare* ECF No. 1 ¶¶ 222, 226, *with* ECF No. 53 ¶¶ 219-223. Plaintiff has also since confirmed that he has never been married, and that his father—who he claimed was deceased to secure additional leave from JPMC—is alive and well. *See* Declaration of Cardelle B. Spangler (ECF No. 87) ("Spangler Decl.") Ex. B at 8, 10 (Pl.'s Sept. 30, 2026 Resps. to JPMC's First Requests for Admission Nos. 13–14, 21–22); JPMC Br. at 6-8. The pattern Plaintiff honed at Morgan Stanley continued here: even the most basic facts seem to change with the occasion—and Plaintiff's inability to tell the truth has no bounds.

**B. Plaintiff supplied his witnesses' supposed "sworn" observations.**

On May 20, 2025, Plaintiff, through Outten & Golden LLP, submitted an internal complaint to JPMC that accused Ms. Hajdini of sexual abuse and discrimination. ECF No. 1 ¶ 19; NYSCEF No. 134 at 4. Within a week, he began—in concert with his longtime friend, Allan Flott,

and his own sister, Chandani Rana—corroborating the accusations with supposed eyewitness support.

On May 27, 2025, Plaintiff asked his sister, Chandani, for help: [redacted] Rodriguez Decl. Ex. D at 00025–27. When she did not respond, Plaintiff's pressure increased. Just three days later, on May 30, Plaintiff continued begging to speak with Chandani: [redacted] *Id.*

That same day (May 30), Flott similarly encouraged Chandani to speak with Plaintiff, explaining that she should "[redacted]."[3] Rodriguez Decl. Ex. D at 00048. Chandani then reported to Flott that she spoke with Plaintiff, but that Plaintiff "[redacted]." Flott responded: "[redacted]" *Id.* Then, expressing some concern, Chandani asked Flott, [redacted] But Flott assuaged her apparent concerns, stating [redacted] *Id.* Plaintiff and Chandani arranged to meet in person on June 7, and Plaintiff told his sister:

> [redacted]

---

[3] Flott is a "self-taught, multimedia artist." *See* https://www.allanflott.com/about.

Rodriguez Decl. Ex. D at 00033. Following this exchange, on Monday, June 9, 2025, Chandani informed Plaintiff that she was speaking with Greg Chiarello, the partner at Outten & Golden LLP that represented Plaintiff in connection with his internal complaint to JPMC. Rodriguez Decl. Ex. D at 00036. She told Plaintiff that she was scheduled to speak to Mr. Chiarello "[redacted]"—i.e., Wednesday, June 11, 2025. *Id.* Then, at 4:19 p.m. on June 11—***just eleven minutes before*** Chandani's scheduled call with Mr. Chiarello—Plaintiff texted his sister:

[redacted]

Plaintiff also managed the follow-up with his lawyer. In July, he said he would attend another call with Chandani and instructed her to [redacted]." Rodriguez Decl. Ex. D at 00038–39. He then supplied a proposed message to his attorney beginning [redacted] *Id.* at 00039-40. It [redacted] *Id*.

Ultimately, after more back and forth between Chandani and Mr. Chiarello, with Plaintiff looped in along the way, Chandani signed her sworn affirmation on July 28, 2025. It falsely claimed that she saw Ms. Hajdini kiss Plaintiff's neck and grab his rear end while he turned away, and that—***just as Plaintiff instructed***—she later encountered them at her building and heard a remark sounding like "I own you Brownie," "or something similar to that." Affirmation of

Chandani Rana ("Chandani Aff.") ¶¶ 5-9 (Kreger Decl. Ex. 1). Just like that, the racial epithets and other language Plaintiff had fed to Chandani became her sworn testimony, transforming Plaintiff's lies into evidence he hoped his lawyers, JPMC, the court, and the media would believe.

Allan Flott provided an equally damning affirmation. His July 2025 account claimed that Ms. Hajdini emerged "completely naked" from a bedroom and said, "you know, I own Chirayu, so you'd better come join." He claimed to hear Plaintiff pleading, "Please stop," behind the bedroom door. Affirmation of Allan Flott ("Flott Aff.") ¶¶ 7–12 (Kreger Decl. Ex. 2). Flott also claimed that, at a Kygo concert on September 13, 2024, he observed a woman being "handsy" with Plaintiff, touching his lap, back, and legs while Plaintiff appeared uncomfortable. *Id.* ¶¶ 2-6. The apartment details track the details Plaintiff supplied while conspiring with Chandani:

| Plaintiff's June 10, 2025 text to Chandani | Flott's sworn affirmation |
|---|---|
| "[redacted]" Rodriguez Decl. Ex. D at 00047. | "When visiting New York, I sometimes stay at Chandani's apartment when she is out of town." Flott Aff. ¶ 7. "I went to sleep on the couch in the living room." *Id.* ¶ 8. |

The affirmations gave Plaintiff's accusations the false appearance of independent corroboration—and gave him and his lawyers a cudgel to wield against Ms. Hajdini. First at JPMC, then in state court and the press, and now here. Yet as Ms. Hajdini has maintained from the outset, she never had romantic or sexual contact with Plaintiff and never set foot in the apartment where he claims the assaults occurred. ECF No. 82 at 1. The manufactured eyewitness accounts made the accusations more lurid, more believable, and far more damaging.

### C. Chandani has now confirmed under oath that her purported observations were false.

As JPMC details in its accompanying brief, the supposed eyewitness corroboration has unraveled. *See* JPMC Br., Argument § I.A. Chandani's sworn recantation leaves no doubt: "I did

not see them. I was not present for any of the events it describes." Chandani Recantation ¶ 3. Plaintiff supplied her account and, during her interview with his lawyer, "passed me written notes and whispered to me about what to say." *Id.* ¶ 7. She withdraws her affirmation "in its entirety" and directs that "[n]o court, party, or other person should rely on it for any purpose." *Id.* ¶ 14.

Nor was J&N without warning. Chandani states that, as early as July 2026, her counsel contacted Plaintiff's attorneys to urge Plaintiff's discontinuance of his claims. Chandani Recantation ¶ 13. By October, the warning was explicit: before J&N moved to withdraw, Chandani's counsel, Patrick Selvey, told Norinsberg that Chandani was recanting. Rodriguez Oct. 22 Decl. ¶ 34. J&N nevertheless sought withdrawal without correcting the fraudulent allegations it had placed before this Court. ECF No. 53 ¶¶ 92–98; ECF Nos. 55–57.

Chandani's recantation also guts Flott's supposed eyewitness account. She confirms that Ms. Hajdini never visited her apartment and that Plaintiff "***did not visit my apartment at any point in 2024, nor did he have independent access to my apartment.***" *Compare* Chandani Recantation ¶ 11 *with* Flott Aff. ¶¶ 7–13. Selvey separately reported, after speaking with Flott's counsel, that Plaintiff had also persuaded Flott to sign a false affirmation. Kreger Decl. ¶ 25.

Chandani's recantation confirms that the supposed independent corroboration was fabricated. This warrants dismissal of Plaintiff's claims and sanctions, as discussed below. But for Ms. Hajdini, the admission comes far too late. Plaintiff and his counsel had already used the false affirmations to lend credibility to the accusations, repeat them in court, and broadcast them worldwide. Chandani can withdraw her affirmation. She cannot undo the damage it caused.

### D. J&N repeatedly vouched for—and trumpeted—the perjured affirmations in court and in the media.

J&N did not simply inherit allegations from prior counsel. It told the state court it had conducted a "comprehensive review" and expressly defended the perjured affirmations as proper.

NYSCEF Nos. 93 at 3, 95 at 4–5, 134 at 4–5. On June 8, 2026, Norinsberg publicly promised "substantial new evidence we have uncovered," and founding partner Bennitta Joseph characterized the harm to Ms. Hajdini as "entirely self-inflicted."[4] On July 27, J&N touted "sworn witness accounts" and an "extensive pre-suit investigation."[5] These pronouncements gave Plaintiff's claims the appearance of legitimacy—backed by experienced counsel and independent, corroborating evidence.

J&N then placed that evidence at the center of its federal complaint. Flott's description of Ms. Hajdini naked in the apartment, lighting a cigarette, claiming ownership of Plaintiff, and inviting Flott to the bedroom for a threesome, became paragraphs 85 through 91 of the complaint. ECF No. 1 ¶¶ 85-91. Chandani's account became the "second independent witness" in paragraphs 92 through 98. *Id.* ¶¶ 92-98. And when Ms. Hajdini sought the witnesses' identities to test their claims, J&N called that request "witness intimidation with a caption on it." It also represented that Norinsberg "stands behind every filing he has made." NYSCEF No. 126 at 15-17.

Neither J&N nor Plaintiff stopped there. Plaintiff told *The Juggernaut* that the two affirmations were "executed on penalty of perjury." Rodriguez Decl. Ex. F. On September 29, Norinsberg told Reuters, "We remain confident in the strength of Mr. Rana's claims and look forward to proving them in court."[6] On October 12, J&N filed an amended complaint repeating both accounts without modification. ECF No. 53 ¶¶ 85-98. Even at the October 6 hearing, J&N invoked the memory difficulties of "sexual assault victims" to defend Plaintiff's inability to identify when the alleged assaults occurred. Spangler Decl. Ex. F (Oct. 6, 2026 Hr'g Tr. 32:6–19).

---

[4] *See* Joseph & Norinsberg, LLC, Press Release (June 8, 2026), available at https://tinyurl.com/ymspxpbj.

[5] *See* Joseph & Norinsberg, LLC, Press Release (July 27, 2026), available at https://tinyurl.com/3cbsy55w.

[6] *See* Jonathan Stempel, JPMorgan Banker Renews Defamation Countersuit Against Sexual Assault Accuser, Reuters (Sept. 29, 2026), available at https://tinyurl.com/4ujb6dkc.

More troubling still is what J&N has *not* said. In August and September 2026, J&N resisted requests for Plaintiff's communications with family members, including Chandani, because those communications were available from Plaintiff and would be produced by him. Rodriguez Decl. Ex. E (Aug. 27 and Sept. 1, 2026 email correspondence). By September 23, J&N's ESI vendor and forensic team were collecting Plaintiff's documents; by October 6, J&N represented to this Court that it had imaged four devices containing approximately 50,000 items. *Id.* (Hincken Sept. 23 email); Oct. 6 Tr. 38:22-39:3. Yet Chandani's production reveals Plaintiff scripting her supposed recollections, coordinating her conversations with counsel, and directing communications about her draft affirmation. These were communications with J&N's ***own client***. Surely J&N obtained, reviewed, and investigated these communications during its "extensive pre-suit investigation," or before it vouched for the affirmations in court filings or included them in Plaintiff's October 12 amended complaint.

J&N cannot credibly claim that its supposedly extensive investigation—backed by forensic collection of tens of thousands of documents—uncovered nothing calling these extraordinary affirmations into question. Either J&N reviewed the communications and knew the corroboration was manufactured, or it chose not to examine the very evidence most likely to expose the fraud—just like it did nothing in response to Chandani's counsel's July 2026 outreach. In all events, neither explanation is consistent with the investigation J&N boasted about conducting; nor does it comport with its professional obligations. *Infra* § III.B; see also N.Y. R. Prof. Conduct 1.16(a); 3.3.

The public humiliation, meanwhile, continues. On October 22, a post bearing Ms. Hajdini's image falsely announced that she had joined OnlyFans—a site known for pornographic content.[7]

[7] OnlyFans is a subscription-based platform where creators charge users for access to their content. Although it also hosts nonsexual material, the platform is widely known for pornographic and sexually explicit content. *See* Dan Milmo, *OnlyFans Owner in Talks to Sell UK-Based Adult Content Platform for £5.9bn*, *The Guardian* (May 23, 2025) (describing OnlyFans as "synonymous with pornography").

As of this filing, it had 3.8 million views, with dozens of other accounts parroting its false statements.[8] That post is hardly an isolated example. For months, strangers have circulated sexualized memes, fabricated social-media posts, and even AI-generated pornography using Ms. Hajdini's name and likeness, accompanied by a relentless stream of vicious commentary portraying her as a rapist and sexual predator and even threatening her with gang rape. NYSCEF Nos. 46-54. So, while the supposed corroboration has collapsed, the public abuse it fueled has not. Still, neither Plaintiff nor J&N has corrected the record. Their silence is indefensible.

## III. ARGUMENT

The Court has inherent authority to sanction a litigant who corrupts the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). That authority permits dismissal and monetary sanctions where fabricated proof was used to obtain a judicial advantage. *Rossbach v. Montefiore Medical Center*, 81 F.4th 124, 138-42 (2d Cir. 2023). Dismissal requires clear evidence, specific findings of willful or bad-faith misconduct, and consideration of lesser remedies. *Id.* at 141-42. Section 1927 and the Court's inherent authority separately permit sanctions against lawyers and law firms that act in bad faith and unreasonably and vexatiously multiply proceedings. 28 U.S.C. § 1927; *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143-48 (2d Cir. 2012); *Banus*, 757 F. Supp. 2d at 399 (bad faith can be inferred "from the clear lack of merit" of the attorney's claims). Sanctions are necessary on both fronts. Plaintiff's manufacture of eyewitness corroboration requires dismissal. J&N's knowing adoption, promotion, and maintenance of that perjured evidence, along with their failure to disclose Plaintiff's fraud on the Court, warrants an express finding of bad faith and an award of fees for the damage it caused.

[8] *See* https://x.com/HoopsCrave/status/2113318723226403191 ("Former JPMorgan Executive Director Lorna Hajdini has reportedly joined OnlyFans.").

**A. Plaintiff's use of perjured and falsified evidence requires dismissal with prejudice.**

Shortly after filing his internal complaint, Plaintiff set his scheme in motion. He enlisted his longtime friend, Allan Flott, and his own sister, Chandani Rana, to lie on his behalf. He supplied the substance of Chandani's affirmation, managed her communications with counsel, and used her sworn account—in court and in the media—as independent evidence that Ms. Hajdini raped him, exerted control over him, and subjected him to racial abuse. *Supra* § II.B. His June 11, 2025 message to Chandani began: [redacted] and that Ms. Hajdini "[redacted]" Plaintiff. Rodriguez Decl. Ex. D at 00040, 00047. Those scripted details became Chandani's sworn testimony. Chandani Aff. ¶¶ 5–9. She now confirms that Plaintiff [redacted], knowing she had witnessed none of it. Chandani Recantation ¶¶ 3, 7, 13. And her counsel has confirmed that Flott's affirmation was also perjured. Kreger Decl. ¶ 25. Plaintiff manufactured a witness to corroborate them, then used their sworn account to prosecute this case and extort JPMC for a payout.

On these facts, dismissal is the only appropriate sanction. In *Rossbach v. Montefiore Medical Center*, the Second Circuit affirmed dismissal with prejudice where the plaintiff fabricated text messages to corroborate allegations of sexual harassment, falsely testified about their origin, and attempted to conceal the fraud. 81 F.4th 124, 138–42 (2d Cir. 2023). Here, Plaintiff supplied his sister's supposed observations and transformed them into sworn evidence that purported to place Ms. Hajdini at the scene of misconduct. Her account, together with Flott's, was carried into successive pleadings as independent corroboration. The factors addressed in JPMC's motion reinforce dismissal. The fabrication was intentional, prejudiced Ms. Hajdini's defense, and was repeated before JPMC and in successive pleadings. The correction came from the witness, not Plaintiff; and the operative complaint still invokes her supposed observations. *See* Chandani

Recantation ¶¶ 3, 7, 9-10, 13-14; ECF Nos. 1, 53 ¶¶ 85-98; *Lawrence v. City of New York*, 2018 WL 3611963, at *6 (S.D.N.Y. July 27, 2018); JPMC Br., Argument § II.

Nor would lesser sanctions suffice. *Rossbach*, 81 F.4th at 139–41; *see* JPMC Br., Argument § III. Excluding the affirmations would still let Plaintiff pursue the accusations he manufactured evidence to support. An adverse instruction would reduce his deliberate fraud to another credibility dispute for the jury. Fees alone would reimburse some expenses but let Plaintiff retain the advantage he sought through fabrication. A litigant who manufactures the evidence needed to sustain his claims cannot insist on proceeding to trial after that fraud is exposed.[9]

The Court should dismiss Plaintiff's claims with prejudice.

**B. Plaintiff and J&N must pay the fees and costs their bad faith caused.**

Ms. Hajdini should not bear the cost of defending litigation propped up by lies and manufactured evidence. The Court may shift fees against parties and counsel who litigate in bad faith; § 1927 and the Court's inherent authority reach attorneys and law firms that unreasonably and vexatiously multiply proceedings. *Chambers*, 501 U.S. at 45–46; *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 143–48 (2d Cir. 2012). Indeed, in *Banus v. Citigroup Global Markets, Inc.*, this Court ordered counsel to pay the defendant's fees because his claims were "so baseless" that they could only have been pursued in bad faith. 757 F. Supp. 2d at 399-403 (Kaplan, J.). These holdings apply here.

Plaintiff's responsibility is straightforward. He carried fabricated evidence through state and federal litigation and into the media—all at Ms. Hajdini's expense. *See* JPMC Br., Argument

---

[9] The record already establishes deliberate fabrication by clear and convincing evidence. Plaintiff's contemporaneous instructions, the resulting affirmation, and Chandani's sworn account of her knowledge and live coaching is dispositive. To the extent material facts require resolution, the Court may weigh the proof, assess credibility, and make specific findings at a focused sanctions evidentiary hearing without trying the underlying merits. *Rossbach*, 81 F.4th at 138-39; Fed. R. Civ. P. 43(c).

§ IV. The resulting defense costs were a foreseeable—and intended—consequence of his fraud. He should pay them.

J&N's conduct independently warrants sanctions. After touting an "extensive pre-suit investigation" and "sworn witness accounts," J&N filed pleadings adopting the fabricated evidence, resisted discovery of the witnesses' identities, and represented that Plaintiff's own production would supply his family communications. *Supra* § II.D. In July 2026, Chandani's counsel contacted Plaintiff's attorneys and urged them to discontinue the case. Chandani Recantation ¶ 13. By October 6, J&N claimed to have imaged four devices containing approximately 50,000 items. Yet on October 12 it filed a 317-paragraph amended complaint repeating the same fabricated accounts. ECF No. 53 ¶¶ 85–98. At any of these points, J&N either knew or should have known that Plaintiff's allegations were made up. Even after Selvey expressly told Norinsberg that Chandani was recanting and her affirmation could not be relied upon, J&N sought withdrawal, quickly and quietly, without correcting anything—sidestepping its professional obligations in the process. Rodriguez Oct. 22 Decl. ¶ 34, NYSCEF No. 152; *see also Galin v. Hamada*, 283 F. Supp. 3d 189, 202 (S.D.N.Y. 2017), *aff'd*, 753 F. App'x 3 (2d Cir. 2018) (a court may impose sanctions for "refus[ing] to withdraw" an allegation or claim "even after it was shown to be inaccurate"); *In re Reyes*, 651 B.R. 99, 137 (Bankr. S.D.N.Y. 2023) ("[A] failure to disclose material facts to the Court may constitute a fraud upon the Court.") (collecting cases); N.Y. R. Prof. Conduct 3.3(a)(1) (a lawyer shall not knowingly "fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer").

The Court should not permit J&N to proclaim an extensive investigation, promote perjured affirmations as sworn proof, and leave that evidence for the Court to unwind as it seeks to withdraw. Controlling Second Circuit authority supports this outcome. In *Liebowitz v. Bandshell*

*Artist Management*, the Second Circuit affirmed sanctions where counsel continued defending a fatally defective complaint despite notice of the underlying facts. 6 F.4th 267, 283–85 (2d Cir. 2021). And *Mata v. Avianca, Inc.* confirms that "[t]he failure to correct a prior statement in a pending motion is the later advocacy of that statement and is subject to sanctions." 678 F. Supp. 3d 443, 460 (S.D.N.Y. 2023). J&N's attempted withdrawal does not permit it to avoid addressing its misconduct.

The Court should make an express finding of bad faith against Norinsberg and J&N. *See, e.g.*, *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012). And ultimately, the Court should hold Plaintiff and J&N jointly and severally liable for all fees Ms. Hajdini has incurred since the outset of this litigation. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–12 (2017) (permitting recovery of the entire defense expense where the lawsuit would not have existed but for the bad faith).[10]

**C. The sanctions order should correct the record and be disclosed to the press outlets Plaintiff and J&N leveraged.**

Dismissal and monetary sanctions alone are not enough. Plaintiff and J&N did more than bring fabricated allegations into court: they broadcast them worldwide and made Ms. Hajdini the subject of a global media spectacle. Her name has become permanently associated with lurid accusations of rape, drugging, and sexual predation, exposing her to worldwide ridicule, sexualized objectification, and public contempt. ECF No. 82, Counterclaims ¶¶ 97–109, 120, 134–42. The consequences have been devastating. Ms. Hajdini lost a longstanding professional affiliation, suffered serious disruption to her personal and professional life, and required treatment

[10] To the extent that additional detail is needed to confirm J&N's role, the Court should confirm J&N's culpability by requiring it to produce documents, communications, and electronic records relevant to this inquiry, then requiring Norinsberg and his colleagues to testify under oath about what they knew, when they knew it, and why they failed to correct the record as New York Rule of Professional Conduct 3.3 requires. *See* N.Y. R. Prof. Conduct 3.3.

for the resulting emotional distress. *Id.* ¶¶ 105–10, 159–63. Dismissing Plaintiff's claims will not erase the headlines, undo the humiliation, or tell the people who made jokes at her expense that the evidence used to justify them was fabricated.

Plaintiff and J&N deliberately gave those accusations the appearance of credibility. As discussed, among other things, Plaintiff emphasized that Chandani and Flott had executed their affirmations under penalty of perjury, and J&N touted "sworn witness accounts" and an "extensive pre-suit investigation." Rodriguez Decl. Ex. F; July 27 Press Release. The supposed independence of that support was central to their public narrative. This evidence was not only presented to the court; it was used to persuade the world that Plaintiff's allegations were true. The Court, through its sanctions order, should seek to reach the same audiences that were told those accusations were supported by sworn, but perjured, proof.

Courts have ample authority to impose such relief. The Second Circuit expressly recognizes nonmonetary sanctions "beyond costs and fees," including mandated disclosure of misconduct. *Mitchell v. Lyons Prof'l Servs., Inc.*, 708 F.3d 463, 469 (2d Cir. 2013). In *Liebowitz v. Bandshell Artist Management*, it affirmed an order requiring sanctioned counsel to distribute the sanctions opinion to clients and other courts. 6 F.4th 267, 292–93 (2d Cir. 2021). And in *Mata v. Avianca, Inc.*, a court in this District required counsel responsible for fabricated judicial opinions to notify those directly affected. 678 F. Supp. 3d 443, 466–67 (S.D.N.Y. 2023). And even more on point, *American Science & Engineering, Inc. v. Autoclear, LLC* required a corrected press release disseminated through the original channels after bad-faith publicity misrepresented judicial rulings. 606 F. Supp. 2d 617, 625–26 (E.D. Va. 2008).

Ms. Hajdini requests a short, Court-approved factual notice stating the Court's actual sanctions findings, accompanied by the sanctions order. The Court should require its distribution

to all outlets and reporters with which Plaintiff, J&N, or any third party publicity agents communicated. Plaintiff and J&N should both certify compliance. That relief will not right Plaintiff and J&N's wrongs. It will, however, require those who used fabricated evidence to give their accusations worldwide credibility to disseminate the Court's ultimate findings through the same channels.[11]

**D. The Court should retain jurisdiction over Ms. Hajdini's counterclaims.**

Dismissal of Plaintiff's claims should not deprive Ms. Hajdini of her ability to adjudicate her counterclaims. They concern the same false accusations, conspiracy among Plaintiff, Chandani, and Flott, and other issues the Court will already need to examine to resolve this motion. Moreover, the parties agreed to bring the counterclaim to this Court, while preserving their original state court filing date. *See* ECF No. 82 at 9 n.4. Requiring Ms. Hajdini to pursue her claims yet again in a different forum would be eminently unfair and would not serve judicial economy, convenience, or fairness. The Court should therefore exercise its discretion to retain jurisdiction over Ms. Hajdini's pending counterclaims. *See* 28 U.S.C. § 1367(c)(3); *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83–86 (2d Cir. 2018).

## IV. CONCLUSION

For these reasons, the Court should grant Ms. Hajdini's motion for sanctions by (1) dismissing all of Plaintiff's claims with prejudice, (2) retaining jurisdiction over Ms. Hajdini's counterclaims, (3) awarding Ms. Hajdini all attorneys' fees and costs incurred from the outset of

[11] Ms. Hajdini recognizes that the Court cannot require any of these media outlets and reporters to actually publish the requested factual notice or underlying sanctions order; but providing notice to these entities and individuals will, at minimum, give them an opportunity to do the right thing and correct their prior reporting.

the state court litigation, with Plaintiff and J&N jointly and severally liable, and (4) exercising its equitable authority to require Plaintiff and his counsel to take steps to rectify their misconduct.[12]

Dated: October 26, 2026

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Melissa C. Rodriguez*
Sam S. Shaulson
Melissa C. Rodriguez
Rebecca Hegazy
101 Park Avenue
New York, New York 10178
Telephone: 212.309.6000
Fax: 212.309.6001
sam.shaulson@morganlewis.com
melissa.rodriguez@morganlewis.com
rebecca.hegazy@morganlewis.com

Brian W. Sullivan
2222 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5000
Fax: 215.963.5001
brian.sullivan@morganlewis.com

*Attorneys for Defendant Lorna Hajdini*

[12] The evidence also raises serious questions concerning potential criminal misconduct, including a coordinated scheme to defraud JPMC and Ms. Hajdini, the procurement of false sworn affirmations, and their subsequent use to perpetrate a fraud on the Court. Such conduct may, in the Court's discretion, warrant referral to the appropriate prosecuting authorities for investigation.

**CERTIFICATE OF SERVICE**

I, Melissa C. Rodriguez, hereby certify that I caused a copy of the foregoing to be electronically filed on October 26, 2026, via the Court's CM/ECF electronic filing system, which will provide notice of this filing to all counsel of record.

*/s/ Melissa C. Rodriguez*
Melissa C. Rodriguez